COMMONWEALTH *vs.* GUS SWAFFORD
(and six companion cases[1]).

Suffolk. December 5, 2003. - March 30, 2004.

Present: MARSHALL, C.J., GREANEY, IRELAND, COWIN, & CORDY, JJ.

*Homicide. Evidence,* Motive. *Jury and Jurors. Practice, Criminal,* Jury and jurors, Required finding, Capital case.

A Superior Court judge properly admitted in evidence at a criminal trial a police officer's testimony concerning gang affiliation, where that evidence was relevant to show motive and joint venture [332-333]; likewise, the judge did not abuse his discretion in qualifying the witness as an expert or in admitting his testimony [333-334].

A Superior Court judge properly discharged a juror from a criminal trial based on the juror's idiosyncratic response (separating herself from the jury, taking leave from participation in their deliberations, and telling the judge four times that she could no longer be fair and impartial) to behavior on the part of her fellow jurors that, although less than civil, could not be described as grossly improper or overbearing, and there was no basis in the record for the claim that the discharged juror was a dissenting juror. [334-337].

At the trial of indictments for murder in the first degree and assault with intent to murder, a Superior Court judge should have allowed one joint venturer's motion for required findings of not guilty, where the Commonwealth offered no direct evidence to prove that the joint venturer in question was the driver of the vehicle from which his codefendant fired the shots that killed one person and wounded two others, and only offered evidence from which the jury could have found that the relevant defendant's vehicle was the one used in the shooting and that he had a motive to seek retribution for a friend and fellow gang member's previously inflicted injuries, which he witnessed. [338-343]

INDICTMENTS found and returned in the Superior Court Department on March 11, 1999.

The cases were tried before *James D. McDaniel, Jr.,* J.

*Charles K. Stephenson* for Ricardo Gittens.

*Dana Alan Curhan* for Gus Swafford.

*Joseph M. Ditkoff,* Assistant District Attorney (*David E.*

[1]Three against Gus Swafford and three against Ricardo Gittens.

*Meier,* Assistant District Attorney, with him) for the Commonwealth.

CORDY, J. Following a jury trial, Gus Swafford and Ricardo Gittens were found guilty of murder in the first degree and of assault with intent to murder.[2] On appeal, Swafford argues that the trial judge erred in admitting gang affiliation testimony and in dismissing a deliberating juror; Swafford additionally argues that the Commonwealth committed improprieties during closing argument and that the judge improperly instructed the jury regarding the use of prior inconsistent statements, creating a substantial likelihood of a miscarriage of justice. Gittens raises claims similar to Swafford's, and additionally argues that his motion for required findings of not guilty should have been allowed, and that the Commonwealth presented false and misleading testimony to the grand jury. Having considered Swafford's claims and undertaken a complete review of the trial record, we affirm his conviction. We conclude, however, that the judge erred in denying Gittens's motion for required findings of not guilty, and therefore reverse the judgments against him. We accordingly do not reach the remainder of Gittens's claims.

1. *Background.* We recite the facts as the jury could have found them, reserving further details for discussion in conjunction with the specific issues raised. The defendants Gus Swafford and Ricardo Gittens were friends and members of the "Theodore Street Posse," a street gang in the Mattapan section of Boston. Located in that same section of Boston, at the end of Evelyn Street, is the Norfolk Street park (park). The park contains a playground area, basketball courts, a hut, tables, and benches.

On the evening of June 17, 1995, the defendants were among a group of ten to twenty people sitting and standing near the hut in the park, drinking and playing cards. John Foreman, a friend of the defendants and a member of the Theodore Street Posse, was also in this group. At some point during the evening, Antonio Jeremiah came to the park. Jeremiah was a life-long resident of Evelyn Street, and a number of those at the hut were

---

[2]Gus Swafford was also convicted of illegal possession of a firearm and ammunition. The ammunition conviction was placed on file with his consent and is not part of this appeal.

friends of his. On seeing Foreman, with whom he had had an argument earlier in June, Jeremiah struck him in the face. A scuffle ensued and Foreman ran from the park pursued by Jeremiah and others. In the course of the chase, Foreman was struck by an automobile but regained his footing and kept running. Jeremiah caught up to him and a punching match ensued which was broken up by unidentified "mutual friends." Foreman left in an undescribed automobile and Jeremiah returned to his home on Evelyn Street.[3]

A short distance from the park, that same evening, there was a gathering of fifteen to twenty-five people outside of 568 Norfolk Street, the home of Jacqueline Bispham. Bispham was a friend of Jeremiah, and her house was a known neighborhood gathering spot for a group of friends associated with the Evelyn Street area of Mattapan. When the fight between Jeremiah and Foreman broke out and the chase ensued, a number of those gathered at 568 Norfolk Street ran to see what was happening.

The gathering at 568 Norfolk Street continued until approximately 1:45 A.M. in the morning of June 18, when an older-model brown hatchback vehicle (with clear windows) slowed or stopped in front of the house. The person in the front passenger seat, subsequently identified years later by eyewitnesses as Swafford, shouted, "What's up?" or "What's up now?" and then fired thirteen shots into the group, killing one person and injuring two more before driving off. The driver was a black male, as is Gittens.

The crime remained unsolved for some time. In January, 1997, police detectives interviewed Swafford, then incarcerated for other crimes, about the shooting. Over the next few weeks, Swafford made repeated telephone calls to friends asking them to go to his grandparents' home to retrieve certain "dogs" or "puppies" that were there. Because Swafford was in prison when he made these calls, they were recorded (as he was aware they could be). As a result of monitoring those calls, the police obtained a warrant and searched Swafford's grandparents' home. They found guns in the places that Swafford had said that his

---

[3]In the early morning of June 18, 1995, an ambulance was summoned to a location on Walk Hill Street where John Foreman was living, at which time Foreman was transported to a hospital.

"dogs" or "puppies" would be. A police ballistician matched one of those guns to the shell casings found after the shooting at 568 Norfolk Street.

2. *Discussion.*

a. *Swafford.*

i. *Gang evidence.* At trial, through the testimony of a Boston detective who had been assigned to the police department's anti-gang violence unit and to the drug control division in Mattapan, the Commonwealth presented evidence regarding a gang known as the Theodore Street Posse. The evidence included the gang's locality (the area surrounding Theodore Street in Mattapan), its graffiti marking (an insignia containing the letters "TSP"), and its membership (including both of the defendants and John Foreman). The Commonwealth presented this evidence in order to establish the defendants' motive: retribution for the beating of a fellow gang member. Both defendants objected to the admission of evidence of gang affiliation at a preliminary motion hearing and at trial, and both again raise the issue on appeal.

We repeatedly have held that evidence of gang affiliation is admissible to show motive or joint venture, and have given deference to judges' determinations in that regard. See *Commonwealth* v. *Correa*, 437 Mass. 197, 201 (2002) ("where evidence of gang affiliation is relevant to the defendant's motive, it is within the discretion of the judge to weigh the probative value of the evidence against its prejudicial effect"); *Commonwealth* v. *Smiley*, 431 Mass. 477, 484 (2000) ("evidence admitted was probative on the issue of joint venture, and the possibility of prejudice was minimized by a strong jury instruction . . . [so] we cannot say . . . that the judge's decision to admit the testimony was palpable error"); *Commonwealth* v. *Maldonado*, 429 Mass. 502, 504 (1999) ("within the discretion of the judge" to admit gang evidence "essential to understanding the motivation behind the crimes"). In so holding, we have noted judges' responsibilities in "minimiz[ing] the prejudicial nature of the evidence" through voir dire of prospective jurors and limiting instructions. *Commonwealth* v. *Correa, supra.* See *Commonwealth* v. *Smiley, supra* at 484; *Commonwealth* v. *Maldonado, supra.*

In this case, the "evidence of gang membership was relevant, and the judge's handling of the matter was exemplary." *Commonwealth* v. *Maldonado, supra* at 505. The gang affiliation evidence falls within the established acceptable use: the Commonwealth used the testimony to establish the defendants' retributive motive and joint venture. During jury empanelment, the judge questioned the potential jurors individually as to whether evidence "that the defendants may have been associated with an alleged gang at the time of the crimes alleged" would "affect [their] ability to be fair and impartial."[4] The judge also carefully and thoroughly instructed the jury, once after the presentation of the gang evidence and again before deliberation, that the evidence could not be considered as evidence that the defendants were of bad character or had a propensity to commit the crimes charged, and, if believed, could only be considered on the limited issues of the defendants' state of mind, motive, and whether they were engaged in a joint venture. There was neither an abuse of discretion nor other error in the judge's handling of this evidence.

In addition to arguing that the gang affiliation evidence was prejudicial, Swafford maintains that the Commonwealth failed to establish an adequate foundation for the testimony, and that the judge improperly qualified the testifying police officer as an expert. At the motion hearing, both defendants objected to the police officer's qualifications; at trial, however, the defendants conceded the officer's qualifications and objected only to the relevance of the gang evidence.[5] The police officer's qualifica-

[4]Sixteen prospective jurors were excused based on their answers to this question.

[5]At sidebar after Gittens's attorney's objection at trial, the prosecutor stated that he "specifically stayed clear of [the detective's] qualifications, his background, and his experience" as part of an "understanding [that] there was an objection by defense counsel to any testimony or evidence that this officer worked for any anti-gang unit or youth violence strike force." Gittens's attorney replied: "I don't question his qualifications, I don't think he's more or less qualified than any other police officer they might want to put on the stand. I question the relevance of this material . . . ." Swafford's attorney joined in that objection.

tions were substantial,[6] the testimonial foundation established at the motion hearing and at trial was adequate,[7] see *Commonwealth* v. *Cintron*, 435 Mass. 509, 521 (2001) (allowing testimony regarding gang affiliation where witness testified to and had "the ability to perceive, recall, and recount information within the witness's personal knowledge"), and we defer to the judge's evidentiary ruling. There was no abuse of discretion in qualifying the witness or in admitting his testimony. Accord *Commonwealth* v. *Smiley*, *supra* at 482-484.

ii. *Dismissal of a deliberating juror.* After the jury had spent roughly twelve hours in deliberation, the judge received a note from juror 16-2: "Hi, Judge. I need to see the Judge." After discussion with the parties, the judge replied by a letter: "*Could* you briefly be more specific as to why you need to talk with the Court, *without* mentioning anything about this case or the Jury's deliberations in any way" (emphasis added). In an effort to ensure that in answer to this inquiry the juror did not inadvertently divulge information regarding the deliberations, the judge additionally wrote: "Please check one of the following: Yes or No." To maintain proper confidentiality within the jury, the judge also advised: "Please do not discuss or share this in any way with other members of the Jury." In response, the juror checked "No." On receiving the juror's response, the judge again discussed the matter with the attorneys, and replied to the juror: "I gather from your response to my note that your request to speak to the Court concerns the Jury's deliberations. That being the case, I am not able to talk with you. The Court is not permitted to speak to any Jury member concerning Jury

[6]The detective testified at trial, and more specifically at an earlier motion hearing, that he was a member of the Boston police department's anti-gang violence unit from its inception in 1990 until 1992, the city-wide drug control division from 1992 until 1994, the drug control division in Mattapan from 1994 until 1996, and then the youth violence strike force (a subunit of the anti-gang violence unit) from 1996 until 2001. He also testified as to his regular observations of the defendants and Foreman during the period preceding the shooting.

[7]The detective described the consistent characteristics of organized gangs, provided examples of gangs active in Boston, and then described, based on his familiarity with gangs and with the Mattapan section of Boston, the Theodore Street Posse and the manner in which it satisfied the characteristics common to such groups. He also testified to his repeated observations of the defendants and Foreman during the period preceding the shooting.

deliberations or any aspect of [them] while the Jury deliberates. Please return to your deliberations. Again, I ask that you not mention this matter to any of your fellow Jurors."

As the jury were preparing for lunch that day, the court officer delivered to the judge a sealed envelope that the jury foreman said contained a note from juror 16-2. The judge did not open the envelope, but through the court officer informed the juror that communications must be directed through the foreman. Shortly thereafter, the foreman sent a note to the judge, stating: "[Juror 16-2], she doesn't think she cannot [sic] work through the case." The court officer then informed the judge that he observed juror 16-2 eating lunch separately from the rest of the jury, and that she told him that she was not participating in the deliberations and wanted to leave.

In the absence of the rest of the jury, but with the parties present, the judge first asked the foreman to be more specific with regard to his note, "without revealing any of the Jury's deliberative process or anything of that nature." The foreman stated that there was a "vibe" between two jurors, and that one of the jurors "feels that she cannot go on with that other person" due to the animosity between them. The judge then questioned juror 16-2. After advising her that they could not discuss the substance of the jury's deliberations, the judge inquired into the situation. Juror 16-2 complained of hostility, and name-calling between herself and another juror. On further inquiry by the judge, juror 16-2 described her complaint as "facial expressions" that another juror made at one point while juror 16-2 spoke, and that the other juror commented that she was "silly" and indecisive. In response to the judge's questions, juror 16-2 repeatedly declared that she could not be fair and impartial if she were ordered to resume deliberations.

The judge found that juror 16-2 "had some kind of animus which was entirely personal to her, [and had] decided in the circumstances . . . that she was not going to be fair and impartial," and dismissed her. In accordance with Commonwealth v. Connor, 392 Mass. 838, 846 (1984), the judge seated the alternate juror, informed the jury that he excused juror 16-2 for personal reasons irrelevant both to her views on the case and to her relationship with the other jurors, and

instructed the jury to begin their deliberations anew.[8] Attorneys for both Swafford and Gittens objected and moved for a mistrial.

General Laws c. 234, § 26B, provides that a trial judge may discharge a deliberating juror if that juror "is unable to perform his duty for any . . . good cause shown." General Laws c. 234A, § 39, provides that trial judges "shall have the discretionary authority to dismiss a juror at any time in the best interests of justice." In *Commonwealth* v. *Connor, supra* at 844-845, we wrote that " '[g]ood cause' includes only reasons personal to a juror, having nothing whatever to do with the issues of the case or with the juror's relationship with his fellow jurors." Allowing discharge only for personal reasons ensures that such action will not "affect the substance or the course of the deliberations." *Id.* at 845 n.4, quoting *State* v. *Trent*, 157 N.J. Super. 231, 239 (App. Div. 1978), rev'd on other grounds, 79 N.J. 251 (1979). While we have established guidelines that trial judges must follow when discharging a deliberating juror, see, e.g., *Commonwealth* v. *Connor, supra* at 843-846, we defer to a judge's assessment of a juror's demeanor, *Commonwealth* v. *Francis*, 432 Mass. 353, 369 (2000), and note that "any irregularity in . . . discharging . . . jurors . . . shall not be sufficient to cause a mistrial or to set aside a verdict unless . . . the objecting party has been . . . prejudiced thereby." G. L. c. 234A, § 74. See *Commonwealth* v. *Zimmerman, ante* 146, 150-152 (2004).

On appeal, Swafford argues that the judge improperly discharged juror 16-2 "as a direct result of conflicts in the jury room directly relating to the jurors' ongoing deliberations," and further asserts that she was a "dissenting juror" and that her discharge therefore was prejudicial.

The judge's finding that juror 16-2's problem was personal to

---

[8]Before releasing the newly constituted jury to deliberate, the judge collected the signed verdict slips that the jury had already completed. After the jury returned their final verdict, the judge opened those slips in the presence of counsel. They revealed that before juror 16-2's dismissal, the jury had found Swafford guilty on all charges, and had not yet made a decision with regard to Gittens. The judge should not have opened the verdict slips, and should have ordered them destroyed (unopened) when he directed the newly constituted jury to begin deliberations anew. *Commonwealth* v. *Tennison*, 440 Mass. 553, 560 n.11 (2003).

her and, inferentially, had "nothing whatever to do with the issues of the case or with the juror's relationship with [her] fellow jurors," *Commonwealth* v. *Connor, supra* at 844-845, was based on his observations of her testimony and demeanor. Where the judge's finding is not clearly erroneous, it warrants our deference. See *Commonwealth* v. *Tennison,* 440 Mass. 553, 560 (2003); *Commonwealth* v. *Kamara,* 422 Mass. 614, 616 (1996). The conduct that eventually led to the juror's dismissal obviously had its roots in perceived slights against her by another juror during the course of deliberations. However, the basis of the dismissal was the juror's idiosyncratic response to behavior that, although less than civil, could not be described as grossly improper or overbearing. The juror physically separated herself from the jury, took leave from participation in their deliberations, and told the judge four times that she could no longer be fair and impartial. In these circumstances, the judge's finding that the juror's reclusive and abdicatory behavior was a problem personal to her, and not in any normal sense the product of her relationship to her fellow jurors, was not clearly erroneous. Cf. *Commonwealth* v. *Leftwich,* 430 Mass. 865, 874 (2000) (no error in dismissal of juror even though "there was some indication that juror's extreme emotional distress was, at least in part, due to deliberations").

In addition, Swafford's claim that juror 16-2 was a dissenting juror is without basis in the record. Although juror 16-2 complained that the other juror alleged that she was indecisive, nothing in her long colloquy with the judge suggested that "the jury were at an impasse, or that [her] statements were 'euphemisms' for the fact that [she] was 'persistent in asserting a minority position during deliberations.'" *Commonwealth* v. *Leftwich, supra,* quoting *Commonwealth* v. *Connor, supra* at 846. In sum, the juror evinced and the judge found "good cause" for her discharge.[9]

iii. *General Laws c. 278, § 33E.* Pursuant to our duties under

---

[9]The judge also could have concluded that it was in the "best interests of justice" to dismiss a juror under G. L. c. 234A, § 39, where the juror's comments "reflected an inability to perform [her] function as an impartial trier of fact." *Commonwealth* v. *Campbell,* 51 Mass. App. Ct. 479, 484 (2001). See *Commonwealth* v. *Garrey,* 436 Mass. 422, 430-431 (2002) (allowing discharge

G. L. c. 278, § 33E, we have reviewed the entire record of the proceedings and considered Swafford's claims regarding alleged improprieties made by the prosecutor during closing argument[10] and regarding the judge's instruction to the jury on the use of prior inconsistent statements.[11] We find no reason to reverse or to reduce Swafford's conviction of murder in the first degree.

b. *Gittens.*

At the conclusion of the Commonwealth's case, Gittens

of deliberating juror whose son was incarcerated in same facility as defendant, as "a compelling reason existed for discharging the juror").

[10]In closing argument, the prosecutor referred to the "Evelyn Street Boys" in connection with Antonio Jeremiah. Swafford argues that, where there was no evidence regarding a gang known as the "Evelyn Street Boys," this improperly suggested that the fight at the park was between gangs. In light of evidence that Jeremiah was associated with a group that congregated near Evelyn Street, the defendants' failure to object to this statement, the judge's instruction to the jury to consider only that evidence admitted at trial, and the strength of the Commonwealth's case against Swafford, we find that this reference does not provide any basis on which to grant relief.

Also in closing argument, the prosecutor said to the jury: "[Y]ou have had the opportunity quite frankly to see three extremely talented attorneys representing [the defendants], thorough, comprehensive, professional. They didn't miss a thing. All of the facts, members of the jury, have been presented to you." Swafford contends that this comment improperly suggested an awareness of facts not in evidence and improperly referred to Swafford's failure to testify or to present evidence. Taken in the context of the prosecutor's closing, it is clear this is not the case.

[11]Swafford argues that the judge's instruction that the jury could consider prior inconsistent statements only for the purpose of impeachment (not for substantive value) was error. Although we do allow the probative use of witnesses' prior inconsistent statements in certain circumstances, e.g., *Commonwealth* v. *Sineiro*, 432 Mass. 735, 741-742 (2000) (inconsistency between trial and probable cause hearing); *Commonwealth* v. *Daye*, 393 Mass. 55, 75 (1984) (inconsistency between trial and grand jury), we have never held (as Swafford suggests that we should) that prior inconsistent statements may be used for probative purposes simply because the events in question were fresher in the witnesses' minds when the statements were made. In his brief, Swafford draws our attention to only two inconsistent statements: one witness who told a police officer on the day after the shooting that the automobile was a "medium-sized hatchback" testified at trial that it was "small"; another witness who told a police officer on the day of or on the day after the shooting that the automobile was an old Nissan or Toyota testified at trial that he was uncertain of the make. These statements, made to police at the scene of the shooting, do not fall within the limited categories for which we have modified the traditional hearsay rules and allowed juries to consider prior inconsistent statements for their probative value.

unsuccessfully moved for required findings of not guilty. In our review of the correctness of the denial of that motion, we consider whether the evidence, together with all reasonable and possible inferences that may be drawn from it, is sufficient to permit a rational jury to find beyond a reasonable doubt the existence of every element of the crime charged. *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979). Gittens's motion should have been allowed.

In order to convict Gittens, the Commonwealth had to prove that he was the driver of the vehicle from which Swafford fired the shots that killed one and wounded two party goers at 568 Norfolk Street. There was no direct evidence offered to prove this proposition. The jury, however, could have found that: (1) Gittens's vehicle was the one used in the shooting[12]; and (2) Gittens was present along with Swafford (and others) when his friend and fellow gang member was assaulted by Jeremiah at the park. This is not enough.

In support of its contention that Gittens was the driver, the Commonwealth emphasizes that he had a motive to seek retribution for Foreman's injuries: Gittens and Foreman were friends and fellow gang members; Gittens witnessed the fight; and the shooting occurred at a house associated with Jeremiah. That Gittens (as well as others) had a motive to commit the crime does not, however, mean that he did commit the crime. Further, that he was associated with one who committed the crime does not prove his participation. See *Commonwealth* v. *Morris*, 422 Mass. 254, 259 (1996) (finding association with known gunmen insufficient to prove presence at scene); *Commonwealth* v. *Fancy*, 349 Mass. 196, 200 (1965) ("it can readily be inferred that [the defendant] associated with persons who committed the larceny, but this does not justify the inference that he participated in the crime").

The Commonwealth also emphasizes that the timing suggests that Gittens was the driver: he was with Swafford at the fight,

---

[12]While the question whether Gittens's automobile was the automobile at the scene of the shooting was vigorously contested at trial, and the Commonwealth's evidence was far from overwhelming on this point, the evidence, viewed in the light most favorable to the Commonwealth, was adequate to support this conclusion.

and thus it is likely that he was with Swafford later at the shooting. In *Commonwealth* v. *Evans*, 438 Mass. 142, 144-147 (2002), cert. denied, 538 U.S. 966 (2003), we affirmed a conviction of murder where, as here, only circumstantial evidence placed the defendant at the scene of the crime, but where direct evidence placed his coventurer at the scene. In that case, however, there was evidence that the coventurers were together minutes before *and* shortly after the murder occurred.[13] *Id.* Similarly, in *Commonwealth* v. *Medeiros*, 354 Mass. 193 (1968), cert. denied sub nom. *Bernier* v. *Massachusetts*, 393 U.S. 1058 (1969), we affirmed the convictions of a defendant where one hour and fifty-two minutes after an automobile, with two people in it, left the scene of the crime, the police found the defendant in that automobile with the person whom the victim positively identified as one of the perpetrators. Key to that case was that the automobile was stopped at a point that was a drive of one hour and forty-five minutes from the crime scene, making it highly likely that the defendant was the person who drove away in the automobile with the identified perpetrator one hour and fifty-two minutes before. There is no similar connecting evidence present in this case.

The Commonwealth did not establish with any precision when the fight took place in relationship to the shooting. While the shooting occurred at approximately 1:45 A.M., the prosecutor virtually conceded in his closing that the fight could have occurred at "10:00 o'clock, 10:30, 11:00 o'clock, [or] 11:30," and argued that it really did not matter. Even assuming that the fight took place at 11:30 P.M., that was still more than two hours before the shooting. There was no evidence that Gittens was with Swafford or driving his automobile during this two-hour period; no evidence that he was with Swafford or driving his automobile in the period after the shooting; and no evidence that he (and not someone else) was driving his automobile at any time on June 17 or June 18.

The Commonwealth argues, however, that the owner of an

---

[13]We also note that eyewitnesses to the murder in *Commonwealth* v. *Evans*, 438 Mass. 142, 147 (2002), cert. denied, 538 U.S. 966 (2003), described one of the assailants of the murder victim in a manner similar in both physique and attire to the defendant. Here the driver was only described by an eyewitness as a black male.

automobile is likely to be the driver.[14] Although we recognize this logic, we cannot say that it supports the Commonwealth's conclusion beyond a reasonable doubt.[15] In *Commonwealth* v. *Morris, supra* at 255-257, we reversed a conviction of murder where the defendant's thumbprint was found on a plastic mask that a gunman (there were five gunmen in all) wore at the scene, recognizing that the presence of an item does not require the presence of its owner.[16] The concept of automobile owners permitting friends or associates to drive their automobiles certainly is not unusual in common experience or in our cases, e.g., *Commonwealth* v. *Sullivan*, 436 Mass. 799, 801 (2002); *Commonwealth* v. *King*, 389 Mass. 233, 244 (1983) ("it is not extraordinary for an individual licensed in one State to borrow a car registered in another State"). There is no evidence to suggest that it is unlikely that Gittens would have permitted someone else to drive his automobile.[17] Cf. *Commonwealth* v. *Sinforoso*, 434 Mass. 320, 329 (2001) ("The jury could certainly infer that no one would lend a car containing in excess of $100,000 in contraband and cash to someone with whom the acquaintance was so slight as not even to know the lender's name"). This is also not a case in which there is substantial inculpatory evidence in addition to the ownership of the

[14]Evidence showed that Gittens had purchased the 1986 hatchback for roughly $500 on or about June 15, 1995.

[15]Cf. *Commonwalth* v. *Deramo*, 436 Mass. 40, 43-44 (2002) (likelihood that vehicle being driven by its registered owner sufficient to satisfy standard of reasonable suspicion).

[16]The thumbprint was not the only evidence suggesting that the defendant was indeed one of the gunmen. One witness stated that the gunman resembled the defendant, one of the vehicles in which the gunmen left the scene was similar in appearance to an automobile owned by the defendant's mother, and telephone calls were made between the defendant's residence and the home and beeper of one of the convicted gunmen. *Commonwealth* v. *Morris*, 422 Mass. 254, 254 n.1, 258-259 (1996).

[17]The Commonwealth argues in its brief that Gittens's sister "never saw the automobile without defendant Gittens," thereby suggesting that he did not permit others to drive his automobile. However, this suggestion is belied by the Commonwealth's evidence that Gittens asked his sister to collect the automobile after it had been towed on October 2, 1995, and that Gittens was not in his automobile when the police stopped it on that date for reasons unrelated to this case. Particularly where there was evidence that this was a gang-related incident and that Gittens was a member of the gang, there may have been good reason for Gittens to permit use of his automobile by another.

automobile. Cf. *Commonwealth* v. *White*, 422 Mass. 487 (1996) (affirming convictions of codefendant brothers where, in addition to witness's identification of one brother's automobile leaving scene at time of shooting, defendants were found and arrested in same automobile three hours after shooting; clothing and weapons seen by witnesses at scene found in automobile; face of one defendant identified by witness; same defendant made incriminating statements to police; and defendants' alibis were inconsistent).

Finally, the Commonwealth emphasizes evidence demonstrating Gittens's "consciousness of guilt": that the windows to his automobile, clear days before the shooting, were tinted months later; that his sister registered the automobile in her name; that, when his automobile was towed in October, 1995, he had his sister retrieve it; and that two months thereafter, he began to drive another automobile. The judge refused the Commonwealth's request that the jury be instructed that they could consider this as evidence of consciousness of guilt. The probative value of this evidence is speculative at best, and inadequate to tip the scales in the Commonwealth's favor. Without evidence as to why or when the windows were tinted, the fact that they were found to be tinted months after the crime is of no probative value at all. Similarly, the fact that, six months after the crime, Gittens was driving another automobile adds nothing of probative value on the issue whether Gittens was driving his automobile in the early morning of June 18, 1995. Finally, it was uncontroverted at trial that Gittens's sister (called as a witness by the Commonwealth) had registered Gittens's automobile in her name at her mother's request because insurance rates were lower in her neighborhood, and that she was asked to retrieve the automobile after it was towed by the police in October, 1995, because she was its registered owner. This adds nothing to the Commonwealth's case beyond pure speculation that, maybe, Gittens had a secondary motive, distancing himself from the automobile because of his involvement in the shooting. Even following this speculative argument, how Gittens intended to distance himself from the automobile by connecting it to his sister remains unexplained.

Taken as a whole, the evidence does not support Gittens's

convictions beyond a reasonable doubt. The Commonwealth established that Gittens had a motive to commit the shooting, and that he *could* have been the driver, but motive and possibility alone do not establish beyond a reasonable doubt that he was in the driver's seat. The inferential leaps that the Commonwealth asks are too great. Accord *Commonwealth* v. *Mandile*, 403 Mass. 93, 94 (1988), quoting *Commonwealth* v. *Ferguson*, 384 Mass. 13, 18 (1981) ("No[] . . . conviction [may] rest upon the piling of inference upon inference or conjecture and speculation"). Because we conclude that Gittens's convictions must be reversed for insufficient evidence, we do not reach the remainder of his claims.

Accordingly, as to Swafford, the judgments are affirmed. As to Gittens, the judgments are reversed, the verdicts are set aside, and the cases are remanded to the Superior Court for the entry of judgments for Gittens.

*So ordered.*