NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11587


COMMONWEALTH  vs.  CRISOSTOMO LOPES.



Suffolk.      September 8, 2017. - January 10, 2018.

Present:  Gants, C.J., Lenk, Budd, & Kafker, JJ.


Homicide.  Jury and Jurors.  Evidence, Relevancy and
     materiality, Prior misconduct, Cross-examination.
     Practice, Criminal, Capital case, Challenge to jurors,
     Argument by prosecutor.



Indictment found and returned in the Superior Court
Department on July 1, 2010.

The case was heard by Patrick F. Brady, J.


Alan Jay Black for the defendant.
Janis DiLoreto Smith, Assistant District Attorney (Patrick
M. Haggan, Assistant District Attorney, also present) for the
Commonwealth.


KAFKER, J.  The defendant, Crisostomo Lopes, pulled the

fourteen year old victim off a motorized scooter and held him,

while the codefendant, a juvenile, shot him multiple times at

close range.  The victim succumbed to a gunshot wound to his

chest shortly thereafter.  After a jury trial, both the

defendant and his codefendant were convicted of murder in the first degree on the theories of deliberate premeditation and extreme atrocity or cruelty.[1]

In his appeal, the defendant claims that reversal of his conviction is required because the judge erred by: (1) failing to find that the Commonwealth's peremptory challenges of prospective jurors were improper; (2) allowing evidence of the defendant's gang affiliation and the victim's brother's knowledge of neighborhood gang activity; (3) precluding the defendant from cross-examining a police officer witness on prior misconduct; and (4) allowing the prosecutor to make improper and prejudicial statements during the Commonwealth's closing argument. For the reasons stated below, we conclude that there has been no reversible error, and after a thorough review of the record, we decline to exercise our authority under G. L. c. 278, § 33E, to reduce or set aside the verdict of murder in the first degree. Therefore, we affirm the defendant's conviction.

Background. We summarize the facts that the jury could have found, reserving certain details for discussion of the legal issues.

The victim was fourteen years old and lived on Norton Street in the Dorchester section of Boston. On May 30, 2010,

---

[1] At the time of oral argument, the codefendant had not yet filed his brief with this court.

the victim had been riding a scooter around Dorchester that was being driven by his fifteen year old brother. Each was wearing a helmet, but different styles. They were riding the scooter on Inwood Street, approaching Olney Street, when the brother almost hit the defendant, who was on a bicycle. The brother stopped the scooter and lifted his helmet.[2] No words were exchanged, and the defendant continued moving.

Sometime after the encounter, the victim asked his brother if he could ride the scooter by himself. The brother agreed, and the victim put on his brother's helmet because it was the better of the two. The brother saw the victim drive away from their home heading toward Ridgefield Street.

Boston police Officer Anthony Williams, a member of the local youth violence strike force, had left work at approximately 7:45 P.M. and was driving home. As Officer Williams drove toward the intersection of Bowdoin Street and Norton Street, he observed the defendant and his codefendant. They appeared to be "on a mission," proceeding hurriedly and rapidly. Officer Williams turned his automobile around to further observe them as they approached Bowdoin Street. He pulled his automobile to the side of the road within close

---

[2] The victim's brother testified that it was a neighborhood rule to lift up one's helmet to prevent being mistaken for someone else.

proximity to the defendant and his codefendant. From his vantage point, Officer Williams testified that he had a clear view of the individuals through his rear passenger and driver's side windows.

At this time, the defendant was riding a bicycle and his codefendant was, at one point, on the back. After they dismounted the bicycle, Officer Williams observed that the codefendant kept his hand stiffly inside his right pocket. Both defendants were looking out toward Olney Street in a crouched position.

As the victim drove the scooter down Olney Street toward Bowdoin Street, Officer Williams observed the defendant dart out into the street, grab the victim's shoulder, and motion to his codefendant. As the defendant held the victim, his codefendant removed a gun from his pocket, ran out into the street, and from approximately one foot away fired shots into the victim's chest. The codefendant fled on foot and the defendant picked up his bicycle and rode away.[3]

Officer Williams got back in his vehicle and notified Boston police operations. Officer Williams then continued his pursuit of the codefendant and observed that he kept his hand in

---

[3] Another eyewitness also observed the shooting and the arrest of the two defendants. The eyewitness testified that the two males he saw arrested were the same two individuals involved in the shooting.

his right pocket throughout the pursuit. While the chase was ongoing, two other officers arrived, including Officer Joseph Singletary, who saw the codefendant reach into his pocket and pull out a gun with his right hand. As the codefendant crossed Stonehurst Street, he bent down near a Toyota Camry automobile and a pickup truck. After the codefendant bent down, his hand was no longer in his pocket.

As the officers were securing the codefendant, Officer Williams saw the defendant, who had returned to the scene. He drew his firearm and ordered the defendant to get onto the ground. The defendant said, "What are you going to do, shoot me? . . . You can catch one, too." As the defendant was placed into custody, Officer Williams heard him yell, "Homes Ave., motherfuckers." An officer who was another member of the youth violence strike force and who had responded to the scene testified that as he placed the defendant into a transport vehicle, the defendant also twice screamed, "That's right, bitches, Homes Ave. on the block."

Officer Singletary recovered a firearm underneath the tire of the Toyota Camry where he had seen the codedendant bend down. That firearm, an Armi Tanfoglio .25 caliber semiautomatic pistol, was found to match all of the ballistic evidence recovered from the scene and from the victim's body. Swabs later taken from the codefendant's hands and the defendant's

shirt revealed the presence of gunshot residue.

The defendant and his codefendant were brought to the police station for booking following their arrest.  The booking officer was a Cape Verdean Creole speaker.  He placed the defendant in a cell close to him, and the codefendant in the cell that was further away.  On at least three occasions, the booking officer heard the defendant yell to his codefendant in Cape Verdean Creole, "Take the fault" and "Can you hear me?"

An autopsy revealed that the victim suffered a gunshot wound to his chest, near his left armpit, and another to his right thigh.  The bullet to the victim's chest pierced through his heart and both lungs, ultimately causing his death minutes later.

Discussion.  1.  Peremptory challenges of prospective jurors.  The defendant contends that the trial judge abused his discretion by failing to determine that the Commonwealth's peremptory challenges were improper.  See Commonwealth v. Jones, 477 Mass. 307, 322 (2017).  Although the defendant's particular objections to the jury selection process are not always clear, we understand him to assert that the Commonwealth improperly used race to challenge jurors and that the judge erred in not asking for an explanation earlier in the process and then accepting the Commonwealth's explanations as adequate and genuine when given.  We conclude that there was no error.  As

explained below, the Commonwealth's challenges were consistently based on potential jurors' youth, which was not improper.  The judge did not therefore abuse his discretion in not requiring explanations for certain earlier peremptory challenges.  Nor did the judge abuse his discretion in determining that the prosecutor's race-neutral explanation -- based on a juror's youth and volunteer service for a youth organization -- was both adequate and genuine.

The Fourteenth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights prohibit a party from exercising peremptory challenges on the basis of race or gender.  See J.E.B. v. Alabama, 511 U.S. 127, 128-129 (1994); Batson v. Kentucky, 476 U.S. 79, 95 (1986); Commonwealth v. Soares, 377 Mass. 461, 486, cert. denied, 444 U.S. 881 (1979) (referencing prohibitions against challenges based on sex, race, color, creed, or national origin).  Peremptory challenges have not, however, been prohibited based on age, under either the United States or Massachusetts Constitution.  Commonwealth v. Oberle, 476 Mass. 539, 545 (2017).

Accordingly, we have held that young adults are not considered a discrete protected group for the purposes of Batson-Soares peremptory challenges and may be excluded. Oberle, 476 Mass. at 545 ("age is not a discrete grouping defined in the constitution, and therefore a peremptory

challenge [of young women] may permissibly be based on age");
Commonwealth v. Samuel, 398 Mass. 93, 95 (1986) ("There is no
constitutional basis for challenging the exclusion of young
persons"); Commonwealth v. Bastarache, 382 Mass. 86, 90, 100
(1980) (in case involving the claimed underrepresentation of
jurors between the ages of eighteen and thirty-four,
"classifications based on age alone do not involve identifiable
or distinctive groups").  Although the United States Supreme
Court has not yet opined on the question, every United States
Court of Appeals that has considered the issue has rejected the
argument that young adults are a protected group for peremptory
challenges.  See United States v. Cresta, 825 F.2d 538, 544-545
(1st Cir. 1987) (prosecutor's systematic challenge of potential
jurors aged eighteen to thirty-four did not violate equal
protection); United States v. Bryce, 208 F.3d 346, 350 n.3 (2d
Cir. 2000) (peremptory strike based on youth of juror, where
other young jurors were also struck, was permissible race-
neutral justification); United States v. Clemons, 843 F.2d 741,
748-749 (3d Cir.), cert. denied, 488 U.S. 835 (1988) (Batson did
not "handcuff a prosecutor's legitimate exercise of peremptory
strikes," which included striking "young . . . panel members");
Howard v. Moore, 131 F.3d 399, 408 (4th Cir. 1997), cert.
denied, 525 U.S. 843 (1998) (challenge of young juror proper
where "age is an acceptable race-neutral factor" [citation

omitted]); United States v. Clemons, 941 F.2d 321, 325 (5th Cir. 1991) (age was legitimate race-neutral reason for peremptorily striking juror similar in age to twenty-two year old defendant); United States v. Maxwell, 160 F.3d 1071, 1075-1076 (6th Cir. 1998) (declining to recognize young adults or college students as distinctive groups for Batson purposes); United States v. Jackson, 983 F.2d 757, 762 (7th Cir. 1993) (in excluding "young adults" from jury, "no court has found a Fourteenth Amendment equal protection violation based on the exclusion of a certain age group from the jury"); United States v. Feemster, 98 F.3d 1089, 1092 (8th Cir. 1996) ("relative youth" qualified as "potential race-neutral factor justifying the exercise of 'peremptory' challenges"); United States v. Pichay, 986 F.2d 1259, 1260 (9th Cir. 1993) (per curiam) ("young adults do not constitute a cognizable group for purposes of an equal protection challenge to the composition of a petit jury"); United States v. Helmstetter, 479 F.3d 750, 754 (10th Cir. 2007) (youth acceptable race-neutral justification for exercising peremptory strike); Willis v. Kemp, 838 F.2d 1510, 1518 (11th Cir. 1988), cert. denied sub nom. Willis v. Zant, 489 U.S. 1059 (1989) ("petitioner failed to establish that young adults aged eighteen to twenty-nine constituted a cognizable group"); United States v. Greene, 489 F.2d 1145, 1149 (D.C. Cir. 1973), cert. denied, 419 U.S. 977 (1974) ("'young persons' is not a

cognizable class").

As a general matter, "[w]e presume that peremptory challenges are properly made, but this presumption can be rebutted by a prima facie showing of either a pattern of challenges of members of the same discrete group, . . . or, in certain circumstances, challenge of a single prospective juror within a protected class, . . . where there is a likelihood that [a prospective juror is] being excluded from the jury solely on the basis of . . . group membership" (quotations and citations omitted). Commonwealth v. Issa, 466 Mass. 1, 8 (2013). A trial judge is strongly encouraged to ask for an explanation as questions are raised regarding the appropriateness of the challenges. See id. at 11 n.14. A judge has the broad discretion to do so "without having to make the determination that a pattern of improper exclusion exists." Id., quoting Commonwealth v. Scott, 463 Mass. 561, 571 (2012).

In determining whether a pattern exists, a judge is to consider all of the relevant facts and circumstances. Jones, 477 Mass. at 322. Such factors to consider in determining a pattern's existence may include (1) "the number and percentage of group members who have been excluded"; (2) "the possibility of an objective group-neutral explanation for the strike"; (3) "any similarities between excluded jurors and those, not members of the allegedly targeted group, who have been struck"; (4)

"differences among the various members of the allegedly targeted group who were struck"; (5) "whether those excluded are members of the same protected group as the defendant or the victim"; and (6) "the composition of the jurors already seated." Id.  See Sanchez v. Roden, 753 F.3d 279, 302 (1st Cir. 2014).

"Once . . . a pattern is found, the burden shifts to the party exercising the challenge to provide a 'group-neutral' explanation for it."  Oberle, 476 Mass. at 545, quoting Commonwealth v. Maldonado, 439 Mass. 460, 463 (2003).  "The judge must then determine whether the explanation is both 'adequate' and 'genuine.'"  Oberle, supra, quoting Maldonado, supra at 464.  We review the judge's decisions on the peremptory challenges for abuse of discretion.  Jones, 477 Mass. at 320.

a.  Jury empanelment generally.  On appeal, the defendant argues that jurors nos. 73, 104, 127, and 129 were improperly struck by the Commonwealth.  To provide context for addressing this claim, we begin by summarizing the jury selection process, including the defendant's objections to challenges to other jurors.  Overall, it was clear that the Commonwealth was exercising its challenges on younger, college-aged jurors.  The Commonwealth used twenty-six of its thirty-two peremptory challenges on jurors under the age of thirty years.  The judge noted the defendant's (and his codefendant's) age-based objections but ruled that age and status as a college student

were not protected classes.

The defendant first raised a race-based Soares challenge when he objected to the Commonwealth's third peremptory strike, targeting an eighteen year old female Asian student.[4] The judge found no pattern and did not require an explanation. He also pointed out that one of the three excluded was a white male. All three of the Commonwealth's peremptory challenges at that point had been exercised on jurors under the age of thirty. Additionally, the Commonwealth had not objected to the first juror seated, a black female.

Next, the defendant objected to the Commonwealth's eighth peremptory strike, a challenge of a twenty-one year old female Hispanic student. Again, the judge found no Soares pattern and did not require a race-neutral reason for the challenge from the prosecutor.[5] At the time of the defendant's challenge, the

---

[4] A document showing the race, gender, and age of each challenged juror was admitted at trial for identification purposes.

[5] Defense counsel again contended that the Commonwealth was striking minority jurors. The judge raised a question whether such a general objection, "lumping" together different minorities, was appropriate or whether the objection needed to be targeted to a particular group. The Commonwealth stated its opinion that challenges needed to be specific to a particular protected group, but also contested the factual underpinnings of the objection. The Commonwealth stated:

"[T]he Commonwealth skip[ped] a female African-American juror, finding her indifferent and being content. Then you

Commonwealth had exercised seven of eight peremptory strikes on jurors under the age of thirty.

b. Jurors nos. 73, 127, and 129. The defendant asserted his next race-based Soares challenge to the Commonwealth's nineteenth peremptory strike, juror no. 73, who was a twenty year old black male college student. Defense counsel described juror no. 73 as the first young black male found impartial. The judge declined to find a Soares pattern. The judge indicated that this was another young juror but saw no pattern as to race and required no explanation from the Commonwealth.[6] Including juror no. 73, at that point, the Commonwealth had used fifteen of its nineteen peremptory strikes on jurors under the age of

---

have a strike of one black female, one white male, one Asian female, one white female, one Asian female, two more white females and a Hispanic female. I don't see how that is, you know, with all due respect, anywhere near a pattern."

We note that "[t]he test in Soares and Batson does not apply to challenges to members of all minority ethnic or racial groups lumped together, but instead applies to challenges to 'particular, defined groupings in the community.'" Commonwealth v. Prunty, 462 Mass. 295, 307 n.17 (2012), quoting Commonwealth v. Soares, 377 Mass. 461, 486 (1979). See Gray v. Brady, 592 F.3d 296, 305-306 (1st Cir.), cert. denied, 561 U.S. 1015 (2010) ("minorities," African-American, and Hispanic jurors are not part of same "cognizable group" for Batson purposes).

[6] As explained above, it would have been well within the judge's discretion to require an explanation, even without finding a pattern. Such questioning could have facilitated our task on appeal, but the judge was not required to do so given the obvious and consistent pattern of the prosecutor challenging young people.

thirty. There was no discernable pattern as to race. The Commonwealth exercised challenges on young jurors irrespective of their race. Of the fifteen jurors under thirty years old struck, ten were white, two were black, two were Hispanic, and one was Asian. We discern no error on the judge's part. The issue on appeal is not whether the judge was permitted to find that the presumption of properly-made peremptory challenges had been rebutted, but whether the judge was required to have so found. Issa, 466 Mass. at 10. He was not so required for juror no. 73.

The race-neutral explanations for the Commonwealth's subsequent challenges of jurors nos. 127 and 129 are also evident from the record. Juror no. 127, the second black male challenged, who was over thirty years old, disclosed that his cousin had been prosecuted by the Suffolk district attorney's office and had been convicted of murder. The defendant did not object to the Commonwealth's challenge to juror no. 127.

Juror no. 129, the third black male challenged, also was over thirty years old and disclosed that his brother had been prosecuted by the Suffolk district attorney's office and, at the time, was incarcerated for the conviction. Further, juror no. 129 stated that, two years prior, he had been arrested in another State and had received a probation sentence for possession of cocaine. The defendant did not object. The judge

did not err in determining that there was no pattern and in requiring no race-neutral reason; juror no. 129's two significant experiences with the law provided a sufficient and obvious basis for the prosecutor's peremptory challenge.

c. Juror no. 104. The judge did not find a prima facie pattern until the third day of empanelment, when the Commonwealth exercised a challenge to juror no. 104, another twenty year old black male college student. Defense counsel claimed that this was the fourth black male out of six jurors in the venire that had been challenged. At that point, the judge required the prosecutor to provide an adequate and genuine race-neutral reason for the decision to strike.

The prosecutor provided two explanations. First, the prospective juror was twenty years old. The Commonwealth further explained that individuals of that age have "difficulties in deciding what classes to take, never mind whether or not somebody is guilty of first-degree murder." Second, the prosecutor stated that this individual should be challenged because, as counsel for the codefendant "point[ed] out, [the juror] works with intercity youth who are underprivileged." Although recognizing that the potential juror was engaged in "absolutely honorable" work, the prosecutor was concerned that the juror would be overly sympathetic to the

codefendant's counsel's juvenile brain development argument[7] and consequently "not follow the law but instead . . . follow his heart." The prosecutor compared the potential juror to a "white woman psychologist" who was rejected earlier for opining that "[sixteen] year olds make impulsive decisions." See Commonwealth v. Jones, 477 Mass. at 322 (one factor to consider in determining whether prima facie case of discrimination has been made is "similarities between excluded jurors and those, not members of the allegedly targeted group, who have been struck"). This argument was responsive to defense counsel's motions to suppress and motion in limine, all of which had argued that juvenile brain development was a mitigating factor. The judge accepted the two reasons given by the prosecutor as separately both adequate and genuine and denied the defendant's request to disallow the Commonwealth's challenge.

We conclude that the judge did not abuse his discretion in determining that the prosecutor's reasons for challenging juror no. 104 were adequate and genuine. See Maldonado, 439 Mass. at 464-466. Although the judge deemed it a close call, and we

---

[7] The prosecutor contended that counsel for the codefendant would be presenting evidence supporting the argument that "because of [the codefendant's] extreme youth, him being only [sixteen] years of age, that in some way . . . mitigates his conduct and that he should be found guilty perhaps of something less than first degree murder, or perhaps even an outright acquittal based upon some belief that his mind is not formed enough."

agree that it was a close question given the number and percentage of qualified black jurors excluded, we discern no abuse of discretion.  See generally, Jones, 477 Mass. at 319-320.  First, the Commonwealth made no secret of the fact that it was exercising its challenges on younger, college-aged jurors irrespective of race, and it did so consistently.  See id. at 322.  Second, the prospective juror's work with youth, given the defense's expected emphasis on the age of the codefendant as an exculpatory factor, provided an additional permissible objective group-neutral explanation.  See id.  Others, including a juror who worked with high school students and another who worked with "juvenile delinquents" outside the targeted group, had been excluded by the judge on this ground.  Third, at the time of the challenge to juror no. 104, the record reflects that five of the fourteen jurors already seated were black (three black women and two black men).  See id.

In sum, the judge reasonably could have found that the common denominator for the Commonwealth's peremptory challenges was not race, but age.  During three days of empanelment, the judge carefully observed the composition of the jury, the composition of the jury venire, and the prosecutor's consistent use of peremptory challenges to exclude young jurors, particularly college students.  The judge determined that there had not been a prohibited pattern of excluding black jurors from

the jury, and we discern no abuse of discretion in any of his decisions on the defendant's objections to the Commonwealth's peremptory challenges.

2. Gang evidence. The defendant contends that the judge erred in admitting evidence concerning his purported affiliation with the "Homes Ave." gang. The defendant objected to the admission of this evidence, and we review for prejudicial error. Commonwealth v. Alphas, 430 Mass. 8, 23 (1999). We conclude that there was no error. The defendant's own statements at the scene of the crime placed the meaning and significance of Homes Avenue at issue. The defendant yelled out: "Homes Ave., motherfuckers," and twice screamed, "That's right, bitches, Homes Ave. on the block". Testimony from a police officer and the victim's brother provided necessary context and explanation.

The background testimony was provided by Officer Anthony J. Serra, a member of the youth violence strike force, who was responsible for monitoring potential gang involvement in Dorchester from 2008 through 2010, and who occasionally patrolled Homes Avenue. Serra testified that, in 2008, "[W]e were at the beginning stages of gathering intelligence . . . about this group that seemed to be emerging in the Homes Ave., Topliff Street area . . .[and] seemed to be identifying themselves with this street, Homes Ave.," and who were wearing clothes with an insignia beginning with the letter "H."

Relatedly, Serra also testified that, in 2008, he saw the defendant wearing a Harvard University athletic jacket.[8]

The victim's brother also was permitted to testify about his own interactions and firsthand knowledge of a group that had formed on Norton Street. He testified, based on his knowledge from the neighborhood, that there was a long-standing and ongoing dispute between the Norton Street group and two neighboring groups, Homes Ave. and the Cape Verde Outlaws. Additionally, the victim's brother testified that, approximately one year before the murder, in 2009, he had had an altercation with some individuals whom he had previously seen in the

---

[8] Officer Anthony Serra also testified that he had a conversation with the defendant on January 16, 2008, while the defendant was being held for a burglary charge. On a couple of occasions during the conversation, the defendant referred to himself as "Homes Ave." and said that his "boys" were also Homes Ave. The defendant contends that the judge erred in denying his motion to suppress these statements because he was not issued his Miranda warnings and was not afforded prompt arraignment as required by Commonwealth v. Rosario, 422 Mass. 48, 56-57 (1996). The Commonwealth contends that Miranda warnings were not required and the Rosario requirements were satisfied. As the 2008 statements about his gang membership are clearly duplicative of other evidence, we need not resolve these issues. Even if admitted in error, the statements were harmless beyond a reasonable doubt. See Commonwealth v. Dagraca, 447 Mass. 546, 552-553 (2006). As explained here, the Commonwealth introduced substantial evidence at trial independent of the January 16, 2008, interview that demonstrated the defendant's gang affiliation. That evidence included the specific statements made by the defendant at the scene of the murder, the testimony that the defendant wore clothing with the "Homes Ave." insignia, and the background information about gangs in the neighborhood, including the Homes Ave. gang.

Dorchester neighborhood of Fields Corner and on Homes Avenue. The individuals attempted to rob him but were unsuccessful. During the altercation, the individuals asked the brother, "Are you from Norton?," to which he responded, "No, I live on Norton," to indicate that he was not affiliated with the group from Norton Street.

Evidence of gang affiliation may be admissible to show motive. Commonwealth v. Swafford, 441 Mass. 329, 332 (2004). We have, however, urged caution in admitting gang-related evidence because of the risk of suggesting that the defendant may have a propensity for criminality or violence. Commonwealth v. Akara, 465 Mass. 245, 267 (2013).

In this case, the gang evidence was properly admitted because it was relevant to the defendant's motive and intent, particularly in light of the "Homes Ave." statements the defendant made at the time of his arrest for the killing in 2010. See Swafford, 441 Mass. at 332 (testimony about gang affiliation allowed to establish defendants' retributive motive); Commonwealth v. Maldonado, 429 Mass, 502, 504-505 (1999) (allowing evidence of gang affiliation relevant to defendant's motive and state of mind). Here, the Commonwealth's theory was that the defendant and his codefendant engaged in a joint venture and killed the victim because they believed that the victim was his older brother, an alleged member of a group

from Norton Street, who earlier had almost hit the defendant with his scooter. Thus, the brother's testimony regarding the ongoing feud between Homes Ave. and the Norton Street group and Officer Serra's testimony that the defendant had been seen wearing clothing that bore an "H" (signifying Homes Ave. gang membership) was relevant in proving the defendant's motive.

The judge took proper steps to minimize any potentially unfair prejudicial impact of the testimony. Akara, 465 Mass. at 268-269. During voir dire, he asked whether evidence of gang membership would affect potential jurors' impartiality.[9] Id. at 268; Commonwealth v. Correa, 437 Mass. 197, 201 (2002). Additionally, the judge instructed the jury that evidence of gang affiliation could not be considered as evidence of the defendant's character or propensity to commit the crimes charged.[10] Id.

---

[9] The judge asked members of the venire:

"There may be evidence in this case that some of the people involved were or may have been involved or affiliated with a gang or gangs. Whether such evidence is introduced and, of course, if it is, the credibility of such evidence and the importance of any such evidence is completely up to the jury to decide. But there may be some evidence of that subject. Would such evidence interfere with your ability to fairly and impartially judge this case?"

[10] The judge instructed the jury:

We therefore conclude that the judge did not abuse his discretion in admitting evidence of the defendant's gang affiliation because the gang evidence admitted was limited and properly went to the issue of motive.  See Swafford, 441 Mass. at 332.  Further, the gang evidence admitted explained the defendant's statements about "Homes Ave." at the scene of the crime.  Finally, the risk of unfair prejudice did not outweigh the probative value of this evidence given the judge's limiting instruction.  See id.

3.  Cross-examination of police witness.  The defendant contends that the judge erred in not allowing the defense to cross-examine Officer Williams, one of the prosecution's key eyewitnesses, about an internal affairs investigation.

---

"There was evidence in the case that [the defendant] was affiliated with a gang or a group known as Homes Avenue.  Like all evidence, it's up to you to determine if it is true, and if it is, how much weight to give it in your deliberations on the charges in this case.  But you should keep in mind the following.  [The defendant] is not on trial for being a member of the Homes Avenue group or gang.  He is on trial for the murder of [the victim] on May 30, 2010.  The evidence concerning his possible affiliation with the Homes Avenue gang or group may provide you with background information relevant to a possible motive in the case, but it would be improper for you to conclude that [the defendant] committed the crime for which he is charged . . . merely because he was a member of Homes Avenue.  You may consider the evidence of [the defendant's] possible gang affiliation as bearing upon the motive for the murder of [the victim], but you may not consider it for the purpose of showing [that the defendant] is or was a bad person or has a propensity for criminality or violence."

Specifically, the defendant sought to impeach Williams with information that the Boston police department had suspended him five years earlier for, among other things, lying in an internal affairs investigation on a personal matter. We conclude that there was no error, as the judge was well within his discretion to exclude this five-year-old evidence of lying.

"In general, specific instances of misconduct showing the witness to be untruthful are not admissible for the purpose of attacking . . . the witness's credibility." Mass. G. Evid. § 608(b) (2017). See Commonwealth v. Hightower, 400 Mass. 267, 271 (1987), and cases cited.[11] Here, Officer Williams's alleged conduct from an internal affairs investigation five years before the murder was not material to the May 30, 2010, homicide investigation. That investigation did not result in a criminal conviction or even a criminal charge. It was also not related to how he conducted police investigations. Thus, it was well within the judge's discretion to conclude that any probative weight of such five-year-old evidence was far outweighed by the risk of distracting the jury with the details of an unrelated

---

[11] We have carved out narrow exceptions, allowing evidence of prior false accusations of rape to impeach a witness's credibility in rape and sexual assault cases. See, e.g., Commonwealth v. LaVelle, 414 Mass. 146, 151-152 (1993), discussing Commonwealth v. Bohannon, 376 Mass. 90, 94-96 (1978), S.C., 385 Mass. 733 (1982).

incident.[12]  Accordingly, we discern no error in the judge's exclusion of this evidence.

4.  Prosecutor's closing argument.  Last, the defendant contends that the prosecutor made improper remarks during the Commonwealth's closing arguments.  Specifically, the defendant claims that he was prejudiced by the prosecutor's characterization of the version of events set forth by codefendant's counsel as an "insult to your intelligence," a "farce of a defense," and a "distraction."

Prosecutors are "entitled to argue forcefully for the defendant's conviction" based on the evidence.  See Commonwealth v. Wilson, 427 Mass. 336, 350 (1998).  "[E]nthusiastic rhetoric, strong advocacy, and excusable hyperbole are not grounds for reversal" (quotations and citation omitted).  Id.  To determine whether an improper argument was made, the prosecutor's remarks are "considered in the context of the whole argument, the evidence admitted at trial, and the judge's instructions to the jury" (citation omitted).  Commonwealth v. Nelson, 468 Mass. 1,

_____

[12] The judge also properly allowed wide-ranging cross-examination of Officer Williams to demonstrate bias or lying on his part.  LaVelle, 414 Mass. at 153 ("in contrast to prior bad acts, evidence of bias is almost never a collateral matter").  In this case, the record demonstrates that, at trial, defense counsel extensively cross-examined Officer Williams on his trial and grand jury testimonies, contemporary reports, and the forensic evidence.  Further, defense counsel repeatedly asserted during closing arguments that Officer Williams was lying.  The defendant's confrontation rights were not violated.

10 (2014).

In the Commonwealth's closing argument, the prosecutor critiqued the theory of counsel for the codefendant that there was a third party who was the actual killer. The prosecutor urged the jury to disbelieve the notion that, if there was further investigation, the evidence may have been different. During closing argument, the prosecutor properly marshaled the evidence admitted at trial, including statements of witnesses, surveillance videotape, and forensic evidence. It was in this context that the prosecutor, over defendant's objection, used the words "insult," "farce," and "distraction." As a specific curative instruction, the judge reiterated to the jury that arguments were not evidence and admonished the jury not to get "carried away by words like 'insult' or 'distraction' or 'farce' or anything like that . . . [and to] treat that as rhetoric."

Placed in context, the prosecutor's statements constituted an overly aggressive response to the argument by the codefendant's counsel but not grounds for reversal. Even when understandably provoked, a prosecutor must not "fight fire with fire." Commonwealth v. Dargon, 457 Mass. 387, 402 (2010). Most importantly, the judge's curative instruction specifically and appropriately eliminated any concern of prejudice. Commonwealth v. Kater, 432 Mass. 404, 424 (2000). Accordingly, we conclude that there was no reversible error arising from the prosecutor's

closing argument.

5. <u>Review under G. L. c. 278, § 33E</u>. We have reviewed the record in accordance with G. L. c. 278, § 33E, and discern no basis to set aside or reduce the verdict of murder in the first degree or to order a new trial. Accordingly, we decline to exercise our authority.

<u>Judgment affirmed</u>.