NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12887

COMMONWEALTH  vs.  JOSE LORA.


Worcester.      February 9, 2024. - June 24, 2024.

Present:  Budd, C.J., Wendlandt, Georges, & Dewar, JJ.


Homicide.  Practice, Criminal, Instructions to jury, Disclosure
    of evidence, Assistance of counsel, Failure to object,
    Argument by prosecutor, Cross-examination by prosecutor,
    New trial.  Evidence, Prior violent conduct, Self-defense,
    Disclosure of evidence, Prior misconduct, Impeachment of
    credibility, Prior inconsistent statement, Cross-
    examination, Argument by prosecutor, Photograph, State of
    mind, Intent, Motive, Opinion.  Constitutional Law,
    Assistance of counsel.  Self-Defense.  Mental Impairment.
    Social Media.  Jury and Jurors.


    Indictment found and returned in the Superior Court
Department on May 20, 2016.

    The case was tried before Paul D. Wilson, J., and a motion
for a new trial, filed on September 10, 2021, was considered by
him.


    Jillise McDonough for the defendant.
    Nathaniel R. Beaudoin, Assistant District Attorney, for the
Commonwealth.

WENDLANDT, J.  In June 2015, the victim, David Luyando, was shot in the head as he was visiting the burial site of a friend in a Worcester cemetery; the victim was an innocent bystander caught in a line of fire targeting Kevin Parker, who was a part of the group that accompanied the victim at the cemetery.  Six days earlier, Parker, who was a member of the Providence Street Posse (PSP), a Worcester-based gang, had shot the defendant, Jose Lora, ostensibly because the defendant, a member of a rival gang, the Kilby Street Posse (KSP), was in the PSP's apparent "territory."  Finding himself face to face with Parker so soon after being shot, the defendant took the opportunity for revenge; he discharged his firearm six times in Parker's direction, fatally striking the victim with one bullet. Following the killing, the defendant disposed of the murder weapon, cleaned the car in which he was travelling, and eventually absconded to the Dominican Republic.

The defendant was returned to the Commonwealth, and following a jury trial in Superior Court, he was convicted of murder in the first degree on a theory of deliberate premeditation.  In this consolidated appeal, the defendant maintains that the trial judge erred by not instructing the jury to consider Parker's known history of violence in connection with their assessment as to whether the defendant had a reasonable apprehension of Parker at the time of the killing,

and that the judge abused his discretion in denying the defendant's motion for a new trial because the prosecutor delayed disclosure of material evidence prejudicing his defense, and because he was provided with ineffective assistance of counsel. After carefully reviewing the defendant's claims on appeal and having conducted an independent review of the entire record, we discern no error and no reason to exercise our extraordinary authority under G. L. c. 278, § 33E, to order a new trial or to reduce the verdict of murder in the first degree to a lesser degree of guilt. Accordingly, we affirm the conviction.

1. Background. The jury could have found the following facts from the evidence presented at trial.

a. Commonwealth's case-in-chief. i. Cemetery shooting. On the afternoon of June 25, 2015, the victim, his aunt, Dawn Sims, his cousin, Ashayla Burrell, and his cousin's friend, Caytlin Pizarro, were at a Worcester cemetery. Sims had driven the victim's group to the cemetery in her Chevrolet Equinox after learning from Burrell's boyfriend, Parker, that a headstone was missing from the burial site of a mutual friend. As discussed supra, Parker was a member of the PSP, a Worcester-based gang prominent in the eastern side of the city. Parker joined the victim's group at the cemetery, arriving separately in a black Hyundai Elantra, along with fellow PSP gang member,

Kevin Mulready.  Neither Parker nor Mulready was armed.  The two vehicles parked on opposite sides of the road near the gravesite.

Sims called the city police department to report the missing headstone.  The victim's group waited approximately forty-five minutes, but the police did not arrive.

As the victim's group prepared to leave, Parker sat in the Elantra's driver's seat.  The victim and Mulready were in the back passenger seats; the victim was on the driver's side.

A third vehicle, a Mazda, approached the two cars.  The vehicle pulled close to the Elantra.  One of the Mazda's windows opened, and Mulready saw a firearm "c[o]me up."  Parker saw the defendant in the Mazda.  As Parker tried to drive away from the Mazda, he heard five to seven shots.  Sims, who was in the Equinox, saw the defendant hanging out of the Mazda[1] and discharging his firearm in the direction of the Elantra.

Pizarro was on her cellular telephone at the time of the shooting leaving a voicemail message for her doctor.  The voicemail recording captures the sounds of six gunshots.  Pizarro saw the window of the Mazda close following the shooting.

---

[1] Burrell also saw the defendant leaning out from the Mazda.

After driving away from the Mazda, Parker turned and saw that the victim appeared to have suffered a gunshot wound to the head; he was struggling to breathe and was choking on his own blood. Parker drove to the hospital. The victim died later that day from a gunshot wound to his head.

ii. Nightclub shooting. As discussed supra, the defendant was a member of the KSP, a Worcester-based gang engaged in a decades-long feud with the PSP. Parker and the defendant had an ongoing "rivalry" that sometimes had turned "physical." At trial, the prosecutor's theory was that the shooting at the cemetery was in retaliation for a shooting that had occurred six days earlier. Specifically, on June 19, 2015, Parker had shot at the defendant as the defendant was in a vehicle near a nightclub in the PSP's "area" on the eastern side of the city; one bullet struck the defendant's arm.[2]

iii. Defendant's activities prior to and after the cemetery shooting. On the day of the cemetery shooting, the defendant asked his friend, Ashley Forget,[3] for a ride to another

_____

[2] A responding police officer, who had been nearby, searched the defendant and his vehicle and found no firearm. The defendant was treated for relatively minor injuries to his arm.

[3] Forget testified pursuant to a cooperation agreement with the Commonwealth.

KSP gang member's home.[4]  At the time, Forget was in Crystal Park in Worcester with Janeshley Delossantos, and a KSP gang member, Fred Taylor.[5]  Forget, accompanied by Delossantos and Taylor, drove her Mazda to the defendant's home, where the group picked him up.  En route to the KSP member's home, Forget drove, Delossantos was in the front passenger's seat, and the defendant and Taylor were in the back seat.  The defendant was on the driver's side.

As the defendant's group neared the cemetery, Forget suggested that they stop to see whether a headstone for their deceased friend had been installed.[6]  As they approached the friend's gravesite, the group saw two vehicles.  Taylor surmised that the vehicles belonged to their friend's family, and Forget pulled the Mazda behind one of the vehicles.

---

[4] The defendant's vehicle was impounded in connection with the police investigation of the nightclub shooting.  As a result, the defendant sought transportation from his friend, Ashley Forget.  Specifically, on the day before the cemetery shooting, Forget gave the defendant a ride to the house of a fellow KSP gang member.  As discussed infra, on the day of the cemetery shooting, the defendant had asked Forget for a ride to this same KSP gang member's home.

[5] A Worcester police officer testified that Taylor was a member of the KSP.  Taylor denied that he was a gang member.

[6] Taylor testified, on cross-examination during the defendant's case, concerning a letter he had written to Delossantos shortly after the cemetery shooting in which he had posited that the defendant suggested the group go to the cemetery, knowing that rival gang members were there.

But Taylor was wrong.  Instead of their friend's relatives, the defendant's group encountered Parker.  Forget noticed Parker "slunched" low in the driver's seat in the vehicle directly across from hers.  The defendant started "freaking out" and said "f*** them."

Delossantos, who was familiar with rumors that Parker had shot the defendant six days earlier,[7] testified that she saw Parker "duck[]" as if searching for something in his car.  She did not see Parker with a firearm, however.  Instead, she saw that the defendant carried a firearm and heard him "clock[]" it.  Forget, who began to drive away, heard multiple gunshots coming from her Mazda; Delossantos also heard the gunshots.

Near the back entrance of the cemetery, the defendant told Forget to stop the car, which she did.  The defendant and Taylor alighted from the car.  The defendant instructed Taylor to dispose of the firearm.

The defendant's group then drove back to Crystal Park and warned KSP members to "get out of there" in light of the shooting that had occurred.  Thereafter, Forget drove to Delossantos's home, where Forget and the defendant cleaned the interior of Forget's Mazda.  The defendant also smashed his

---

[7] Taylor later testified, in connection with the defense, that he also had heard that Parker was the rival gang member responsible for the nightclub shooting of the defendant just six days earlier.

cellular telephone and discarded the pieces.  He remarked to Forget and Delossantos that he hoped that he had "hit KP." Delossantos testified that "KP" was Parker's nickname.

Days after the shooting, the defendant fled to the Dominican Republic, where he stayed for several months.  While there, he made several posts on his social media account.  In one post, which was dated approximately three weeks after the shooting, the defendant stated, "I will never drop my stripes[.] I did too much to get them[.]"  In another post that same day, the defendant stated, "[G]od protect me from my friends[.]  [I] can take care of my enemies[.]"

A .380 caliber firearm was found at the cemetery near the crime scene.  Along the road where the shooting occurred, five spent shell casings were recovered; ballistic testing showed that the casings had been ejected from the .380 caliber firearm. One spent projectile, matching the caliber of the weapon found at the scene, was recovered from the Elantra in which the victim had been shot.

b.  The defense.  At trial, the defendant asserted that, although he had shot the victim, he had acted in self-defense. The defendant, who took the stand in his own defense, testified that when Forget pulled behind one of the vehicles near the gravesite of their friend, Taylor grabbed the defendant's leg and gave him a "paranoid" look.

The defendant then saw Parker holding a firearm "right in [the defendant's] face."[8]  The defendant ducked down, cocked his own weapon, and fired "wildly" in Parker's general direction. He asserted that he did so to defend himself and his friends. The defendant acknowledged that he disposed of his weapon and cellular telephone following the cemetery shooting, explaining that he did so because he feared being arrested.

The defendant also testified to two incidents that he claimed affected his state of mind at the time of the cemetery shooting.  The first occurred in October 2014, approximately eight months before the cemetery shooting.  At that time, the defendant witnessed the drive-by shooting of his best friend, Christian Obeng, as the two were leaving the defendant's relative's apartment in Worcester.  After Obeng's death, the defendant "didn't know what to do with [him]self" and "felt lost in the world."

The second incident was the shooting of the defendant by Parker outside of a nightclub in the eastern side of Worcester; as discussed supra, this shooting transpired just six days before the cemetery shooting.  Although the defendant did not obtain a firearm after Obeng's death, he testified that he

---

[8] Although Delossantos and Taylor both testified that they saw Parker leaning down or grabbing something from his vehicle, no witness other than the defendant testified that Parker was armed.

obtained a firearm after he was shot because "too much stuff was happening in [his] life."[9]  Following the nightclub shooting, the defendant testified, he was afraid and no longer wanted to leave his house or live in Worcester.[10]  While the nightclub shooting had affected his state of mind, the defendant testified that he did not know that Parker had shot him.  Dr. Eric Brown, a clinical and forensic psychologist, testified for the defense. He opined that witnessing Obeng's death and then being shot himself outside the nightclub left him in a state of "acute fear and paranoia."  According to Brown, the defendant exhibited symptoms of paranoia, hypervigilance, and depression.  Based on a psychiatric assessment, Brown opined that the defendant had posttraumatic stress disorder (PTSD) on the day of the cemetery shooting.

Taylor also testified on the defendant's behalf; he stated that, as Forget pulled her car near the two vehicles parked near

---

[9] On cross-examination, the prosecutor impeached the defendant, showing that his testimony that he had not possessed a firearm until June 2015 and that he had not sold drugs were inconsistent with his 2011 juvenile delinquency adjudication for illegally carrying a firearm and his 2017 guilty pleas to charges related to trafficking heroin, respectively.

[10] The defendant's statement that he did not leave his house in the days before the cemetery shooting was contrary to Forget's testimony that she provided a ride to the defendant to his fellow KSP gang member's house on the day before the shooting.

their friend's gravesite, Taylor identified Parker and said, "That's Kevin."[11] Taylor noticed that Parker appeared to be surprised and reached under his seat to try to grab something and pull it up. Taylor could not identify the object.

On cross-examination, Taylor acknowledged his grand jury testimony that the defendant had told him that the shooting was "payback." He also acknowledged a letter he had written to Delossantos a few days after the cemetery shooting in which Taylor stated that the defendant "basically set us up to be his ride" to the cemetery and someone must have called the defendant and told him "where the ops[12] were." As discussed supra, Forget had testified that it was her idea to stop by the cemetery.

2. Procedural history. The defendant was indicted for murder in the first degree, G. L. c. 265, § 1; carrying a firearm without a license, G. L. c. 269, § 10 (a); and carrying a loaded firearm without a license, G. L. c. 269, § 10 (n). The Commonwealth dismissed the firearm charges, and a jury convicted the defendant of murder in the first degree on the theory of deliberate premeditation. The defendant timely filed a notice of appeal. The defendant's motion for a new trial was denied by

---

[11] Although Taylor was on the Commonwealth's witness list, he was not called in its case-in-chief.

[12] Taylor explained that "ops" was a term for rival gang members.

the trial judge.  We consolidated the defendant's timely appeal from that order with his direct appeal.

3.  Discussion.  The defendant maintains that the trial judge erred by not instructing the jury to consider Parker's known history of violence in connection with their assessment as to whether the defendant had a reasonable apprehension of Parker at the time of the killing, and that the judge abused his discretion in denying the defendant's motion for a new trial because the prosecutor delayed disclosure of material evidence, and because the defendant was provided with ineffective assistance of counsel.  We address each contention in turn.

a.  Jury instruction.  The defendant first maintains that the judge erred by not instructing the jury to consider Parker's prior violent conduct when considering the defendant's claim that he acted in self-defense.  In connection with a claim of self-defense, the defendant may offer "evidence of specific violent acts by the victim that were previously known to the defendant" to "demonstrate . . . the defendant's reasonable apprehension of the victim."  Commonwealth v. Souza, 492 Mass. 615, 621 (2023), citing Commonwealth v. Fontes, 396 Mass. 733, 735-736 (1986).[13]  The jury may consider such evidence if the

_____

[13] "To establish that the defendant did not act in proper self-defense, the Commonwealth must prove at least one of the following propositions beyond a reasonable doubt:  (1) the defendant did not have a reasonable ground to believe, and did

defendant knew of such conduct.  See Fontes, supra; Model Jury Instructions on Homicide 28 (2018).

At trial, the judge discussed with the prosecutor and trial counsel the appropriateness of giving an instruction regarding Parker's prior violent conduct in view of the defendant's testimony that he was not aware that Parker had been the person who had shot the defendant six days prior to the cemetery shooting.  Trial counsel did not object to the judge's conclusion to forgo the instruction.  Therefore, "our review is limited to whether the [failure to give the] instruction was erroneous and, if so, whether it created a substantial likelihood of a miscarriage of justice."  Commonwealth v. Mercado, 456 Mass. 198, 205 n.14 (2010).

When determining whether to provide a self-defense instruction, including an instruction regarding the jury's consideration of a victim's prior violent conduct, the evidence must be viewed in the light most favorable to the defendant. Commonwealth v. Yat Fung Ng, 489 Mass. 242, 253 (2022), S.C., 491 Mass. 247 (2023).  Here, while the defendant testified that

---

not believe, that he was in imminent danger of death or serious bodily harm, from which he could save himself only by using deadly force; or (2) the defendant had not availed himself of all proper means to avoid physical combat before resorting to the use of deadly force; or (3) the defendant used more force than was reasonably necessary in all the circumstances of the case."  Commonwealth v. Glacken, 451 Mass. 163, 167 (2008).

he did not know that Parker shot him,[14] Taylor testified that the defendant told Taylor that the cemetery shooting was "payback." Forget and Delossantos also testified that, following the shooting, the defendant stated that he hoped he had "hit KP." Coupled with Delossantos and Taylor's testimony that they had heard rumors that Parker had shot the defendant, and viewed in the light most favorable to the defendant, the jury could reasonably find that the defendant was aware that Parker was the person who had shot him outside the nightclub a few days earlier. See id.

Assuming, arguendo,[15] that the judge erred in not giving the instruction regarding the defendant's knowledge of Parker's prior violent conduct, we turn to consider whether the judge's failure to do so resulted in a substantial likelihood of a miscarriage of justice. See Mercado, 456 Mass. at 205 n.14. To find that the defendant held a reasonable apprehension based on

---

[14] The Commonwealth proceeded under a theory of transferred intent, that is, that the defendant's intent to kill Parker transferred to the victim, making Parker's prior violent conduct relevant. See Commonwealth v. Andrade, 488 Mass. 522, 540 (2021), quoting Commonwealth v. Colas, 486 Mass. 831, 837 (2021) ("If a defendant intends to kill one person, and mistakenly kills another, under the doctrine of transferred intent the defendant is treated as though he or she intended to kill the other individual").

[15] We do not conclude the judge erred in not providing this instruction where, as here, trial counsel did not request it -- a decision that was manifestly reasonable. See note 17, infra.

Parker's prior violent conduct, the jury would have had to discredit the defendant's testimony that he was unaware that Parker had shot him. Such a conclusion that the defendant testified falsely under oath would have undermined the self-defense theory; after all, the theory required the jury to believe the defendant, who was the only witness to testify that Parker was armed at the cemetery. Indeed, the instruction may have had the ill effect of bolstering the prosecutor's theory that the shooting was motivated by the defendant's desired vengeance.[16] Under the circumstances, any purported error in failing to instruct the jury as to their consideration of

---

[16] The defendant also contends that the judge, sua sponte, should have instructed the jury as follows in connection with their assessment of the defendant's claim of mental impairment at the time of the shooting:

> "You may consider the defendant's mental condition at the time of the killing, including any credible evidence of mental impairment . . . in determining whether the defendant actually believed that he was in immediate danger of serious bodily harm or death . . . ."

Model Jury Instructions on Homicide 29. The defendant did not request this instruction, and "[a]bsent a request from a defendant, . . . a judge is [not] required to instruct the jury on [a mental impairment] defense." Commonwealth v. Santiago (No. 2), 485 Mass. 416, 422 (2020). We address in part 3.c.i, infra, whether trial counsel's failure to request a mental impairment instruction constituted ineffective assistance of counsel.

Parker's prior violence did not create a substantial likelihood of a miscarriage of justice.[17]  See note 21, infra.

b.  Delayed disclosure of evidence.  We turn next to the defendant's claim that the judge abused his discretion in denying the defendant's motion for a new trial on the ground that the prosecutor delayed disclosing (1) two posts from the defendant's social media account, which were posted three weeks after the killing and in which the defendant stated, "[G]od protect me from my friends[.]  [I] can take care of my enemies," and "I will never drop my stripes[.]  I did too much to get them" (social media posts); (2) a letter written by Taylor shortly after the cemetery shooting in which Taylor told Delossantos that the defendant had "set [them] up," suggesting that the defendant had planned to take them to the cemetery knowing that rival gang members were there (Taylor letter); (3) the defendant's statement to Worcester police Officer Peter Roberge on the night of the Obeng shooting, denying his gang affiliation (defendant's gang statement); and (4) Roberge's statement that the defendant's friend group returned fire on the night of the Obeng shooting (Roberge statement).

_____

[17] For the same reason, any claim that trial counsel was ineffective in failing to request the prior violent conduct instruction also fails.  Commonwealth v. Gumkowski, 487 Mass. 314, 325, 327 (2021) (ineffective assistance of counsel claim for failure to object to jury instructions assessed under same "substantial likelihood of a miscarriage of justice" standard).

In reviewing the denial of a motion for a new trial, we "determine whether there has been a significant error of law or other abuse of discretion, . . . and whether any such error create[d] a substantial likelihood of a miscarriage of justice." Commonwealth v. Rodriguez-Nieves, 487 Mass. 171, 176 (2021), quoting Commonwealth v. Vargas, 475 Mass. 338, 355 (2016). Where, as here, the motion judge was also the trial judge, we extend special deference to the judge's decision because he "was in a 'superior position to assess the credibility of the defendant's claims.'" Commonwealth v. Upton, 484 Mass. 155, 162 (2020), quoting Commonwealth v. Freeman, 442 Mass. 779, 792 n.14 (2004), S.C., 451 Mass. 1006 (2008). See Rodriguez-Nieves, supra.

When addressing a claim that the prosecutor has delayed disclosure of material evidence,[18] we consider whether "[t]he

---

[18] The Commonwealth had an obligation to disclose the social media posts and the letter authored by Taylor, who was on the Commonwealth's witness list. See Mass. R. Crim. P. 14 (a) (1) (A), as amended, 444 Mass. 1501 (2005) ("The prosecution shall disclose to the defense . . . each of the following items . . . provided it is relevant to the case . . . : (i) Any written or recorded statements . . . made by the defendant . . . (vii) Material and relevant police reports, . . . and statements of persons the party intends to call as witnesses"). Moreover, because the defendant's gang affiliation and gang rivalry were central to the case, the prosecutor should also have disclosed the defendant's statement to Roberge and Roberge's information concerning the Obeng shooting. See id. Cf. Commonwealth v. Correia, 492 Mass. 220, 225 (2023) (prosecution had obligation to disclose defendant's rap lyrics brought forth for first time on defendant's cross-examination).

defendant has . . . made a showing of bad faith on the part of the prosecution." Commonwealth v. Stote, 433 Mass. 19, 23 (2000). In the absence of bad faith,[19] we consider "whether the defendant has shown that he was prejudiced in his ability 'to make effective use of the evidence in preparing and presenting his case' when he first learned of the evidence in the heat of trial." Rodriguez-Nieves, 487 Mass. at 177, quoting Commonwealth v. Adrey, 376 Mass. 747, 755 (1978), S.C., 397 Mass. 751 (1986). "[I]t is the consequences of the delay that matter, not the likely impact of the nondisclosed evidence."

---

The defendant supported his contention that the information was not disclosed pretrial with an affidavit of trial counsel, which the judge was warranted in crediting. Commonwealth v. Sylvain, 473 Mass. 832, 838 (2016) (motion judge may "properly rel[y] on the affidavits submitted in support of the defendant's motion for a new trial").

[19] The judge found that the prosecutor did not act in bad faith, crediting the prosecutor's affidavit, in which the prosecutor averred that he had "never intentionally withheld evidence or delayed the disclosure of evidence to a defendant," that he and trial counsel "were in fairly close contact during the build-up to trial," and that he "continued to provide [trial counsel] with discovery as [he] received it, including in the days before trial began." The defendant speculates as to the prosecutor's motives based on allegations regarding the conduct of prosecutors at the office of the district attorney for the middle district. In the circumstances, the judge's decision to credit the affidavit was not clearly erroneous. See Upton, 484 Mass. at 164 (motion judge, who was also trial judge, "explicitly endorsed the prosecutor's specific, credible, and repeated on-the-record denials of an undisclosed plea agreement" [quotation and alteration omitted]).

Rodriguez-Nieves, supra at 179, quoting Commonwealth v. Almeida, 452 Mass. 601, 609-610 (2008).

i. Social media posts. The defendant contends that if the prosecutor had disclosed the social media posts timely, trial counsel would have filed a motion in limine to exclude them. Because the social media posts reference, albeit vaguely, past actions by the defendant that suggest involvement in misconduct against "enemies" and misconduct to merit apparent esteem within a gang, they should be analyzed as prior bad act evidence. See Commonwealth v. Correia, 492 Mass. 220, 229-230 (2023) (prior bad act evidence includes statements "convey[ing] ideas or acts that themselves could be considered bad acts"). "Although evidence of prior or subsequent bad acts may not be offered to prove bad character or criminal propensity, such evidence may be admitted for another purpose where its probative value is not . . . outweighed by the danger of prejudice" (quotation and citation omitted). Commonwealth v. Lally, 473 Mass. 693, 712 (2016). Evidence of subsequent bad acts is admissible to "show the whole transaction of which the crime was a part," so long as the evidence is "connected with the facts of the case" and "not . . . too remote in time." Commonwealth v. Samia, 492 Mass. 135, 148 (2023), quoting Commonwealth v. Cardarelli, 433 Mass. 427, 434 (2001).

Here, the posts were relevant to the defendant's state of mind at the time of the cemetery shooting, were probative of the defendant's retaliatory intent, and had a tendency to show that the defendant did not act in self-defense. See Commonwealth v. Mendes, 441 Mass. 459, 466 (2004) ("Evidence of the defendant's spending habits after the murder was admissible because it was probative of his mental state at the time of the murder"). See also Correia, 492 Mass. at 228-230 (defendant's statements akin to bad act evidence admissible to show state of mind); Mass. G. Evid. § 404(b) (2024). Although the posts were made approximately three weeks after the killing, they were not too remote in time to be probative of the defendant's state of mind. See Cardarelli, 433 Mass. at 434 (evidence of defendant's gambling spree two weeks after killing wife was "properly admitted to establish motive" that defendant wanted to kill his wife to spend their joint assets). In addition, the posts did not highlight any specific acts of violence. Cf. Correia, supra at 232 (rap lyrics' prejudicial effect outweighed probative value where lyrics "highlight[ed] living a life of crime, neighborhood wars, and disliking the police [and] hardly were probative of the defendant's self-defense claim"). Accordingly, the judge did not err in concluding that the proposed motion in limine would have been unsuccessful and that the defendant did not show prejudice from the delayed disclosure.

ii. Taylor letter. During his grand jury testimony, Taylor was questioned about a letter he had written to Delossantos in the aftermath of the cemetery shooting. In that letter, Taylor stated that "[the defendant] basically set us up to be his ride," that someone must have called the defendant and told him where the "ops" were, and that "we [(Taylor and Delossantos)] both know [Taylor] didn[']t have nothin[g] to do with that or knew it was happenin[g]. [The defendant] did." At trial, Taylor testified contrary to these statements; accordingly, the prosecutor used the letter to impeach him.

The defendant asserts that had he known about the Taylor letter prior to the commencement of the trial, he would have filed a motion in limine to exclude it. The judge concluded that such a motion would have failed. We agree. See Commonwealth v. Parent, 465 Mass. 395, 400 (2013), quoting Commonwealth v. Basch, 386 Mass. 620, 623 (1982) ("A party has a right to impeach [a] witness's testimony by means of prior inconsistent statements . . .").[20]

---

[20] The defendant wrongly contends that the judge limited trial counsel's redirect examination regarding the Taylor letter. In context, it is clear that the judge limited trial counsel's questions whether Taylor was badgered by the prosecutor during cross-examination; an issue the judge determined the jury could "judge for itself whether that was badgering." This was not an abuse of discretion.

During closing argument, the prosecutor argued that the letter showed the defendant went to the cemetery knowing that rival gang members were present. See Commonwealth v. Denson, 489 Mass. 138, 149-150 (2022) (prosecutor's reference in closing to prior inconsistent statement "not for impeachment purposes . . . but as substantive evidence . . . improperly employed the statement for its truth"). Nothing about the timing of the disclosure of the letter prevented trial counsel from objecting to the argument. See Rodriguez-Nieves, 487 Mass. at 179, quoting Almeida, 452 Mass. at 609-610.[21]

---

[21] Trial counsel's failure to object to the prosecutor's use of the Taylor letter, which itself was contradicted by Forget's testimony, did not create a substantial likelihood of a miscarriage of justice. See Commonwealth v. Gibson, 492 Mass. 559, 568 (2023). Other evidence strongly indicated that the defendant did not act in self-defense. Of the nine people who witnessed the shooting and testified, only the defendant stated that he saw "someone" in Parker's car holding a firearm. The defendant's testimony that, upon seeing the gun, he ducked and shot wildly out the window is belied by the testimony of witnesses who saw the defendant hanging out of the Mazda's window and shooting directly toward Parker's car. The ballistics evidence, including the five shell casings strewn on the road where the shooting occurred, supported these witness accounts. There was no return fire, and the spent casings found at the crime scene only belonged to the defendant's firearm. The voicemail recording played for the jury confirms that the defendant shot at Parker's vehicle six times as it sped away.

Overwhelming evidence also supported the prosecutor's theory that the defendant shot Parker with deliberate premeditation because of their personal and gang rivalry as well as the nightclub shooting. See Commonwealth v. McGann, 484 Mass. 312, 326 (2020) ("The jury were free to reject the defendant's testimony and instead credit the evidence presented by the Commonwealth"). The defendant obtained a firearm after

iii.  _Defendant's gang statement_.  On cross-examination, the defendant stated that he had been a member of the KSP for well over a decade.  Referencing a police report, the prosecutor asked the defendant whether he had, on the night of the Obeng shooting, told Roberge that he was not in a gang.  The defendant responded, "If that says it, yeah."  When asked whether he "lied to the police then, too," the defendant responded, "Yes."

The defendant contends that, if the police report had been disclosed prior to trial, he would have moved to exclude reference to it.  However, the report recorded the defendant's prior inconsistent statement and was used to impeach him; the judge properly concluded that the statement would not have been excluded for this purpose by a pretrial motion.  See _Parent_, 465 Mass. at 400.

iv.  _Roberge statement_.  On cross-examination, the prosecutor asked Roberge whether "the individuals who shot Mr. Obeng were also shot at by the individuals with Mr. Obeng."

---

the nightclub shooting, suggesting that he was planning his vengeance.  As several witnesses testified, the defendant recognized Parker as the person in the car in the cemetery as Forget pulled the Mazda near it.  Upon seeing Parker, the defendant exclaimed "f*** them."  He then "clocked" and fired his firearm six separate times while hanging out the window adjacent to Parker's car.  Thereafter, he directed Taylor to discard the gun, destroyed his cellular telephone, and cleaned Forget's car.  Days later, he fled to the Dominican Republic. The defendant also explained to Taylor that the cemetery shooting was "payback," and told Forget and Delossantos that he hoped he hit Parker.

Roberge responded, "Correct."  The prosecutor then asked, "And one of those individuals with Mr. Obeng was [the defendant]?"  Roberge again responded, "That is correct."  Trial counsel did not object.  But he later averred that, if he had known Roberge would testify to someone firing back during the Obeng shooting, he would have attempted to impeach Roberge's testimony with eyewitness statements that there was only one shooter or moved to exclude the testimony.  The judge found that the defendant was not prejudiced by any delay in disclosing Roberge's account of the Obeng shooting because nothing prevented trial counsel from impeaching Roberge at trial when he made the statement and the statement "was not crucial to either parties' case."  Given the extensive evidence supporting the defendant's guilt, we cannot say the judge abused his discretion in so concluding.  See note 21, supra.  See also Rodriguez-Nieves, 487 Mass. at 177; Stote, 433 Mass. at 24-25 (no prejudice where "defense counsel was permitted to cross-examine [witness] extensively" and timely disclosure "would not necessarily have aided [the] defense").

c.  Ineffective assistance of counsel.  We turn next to the defendant's claim that the judge abused his discretion in denying the defendant's motion for a new trial because trial counsel provided constitutionally ineffective assistance.  "When reviewing a defendant's appeal from the denial of a motion for a

new trial in conjunction with the direct appeal of a conviction of murder in the first degree, 'we do not evaluate [the] ineffective assistance claim under the traditional standard set forth in Commonwealth v. Saferian, 366 Mass. 89, 96 (1974).'" Commonwealth v. Gibson, 492 Mass. 559, 568 (2023), quoting Commonwealth v. Melendez, 490 Mass. 648, 656-657 (2022). "Instead, we apply the more favorable standard of G. L. c. 278, § 33E, and review the defendant's claim for a substantial likelihood of a miscarriage of justice." Gibson, supra. Specifically, we consider "'whether defense counsel committed an error in the course of trial,' and if there was error . . . 'whether it was likely to have influenced the jury's conclusion.'" Id., quoting Commonwealth v. Ayala, 481 Mass. 46, 62 (2018).[22] "Where a defendant challenges tactical or strategic decisions by trial counsel, the court will find ineffective assistance 'only if such a decision was manifestly unreasonable when made.'" Commonwealth v. Weaver, 474 Mass. 787, 808 (2016), aff'd, 582 U.S. 286 (2017), quoting Commonwealth v. Diaz, 448 Mass. 286, 288 (2007).

---

[22] The judge properly applied the Saferian standard. See Commonwealth v. Norris, 483 Mass. 681, 686 n.4 (2019) ("The defendant incorrectly states that his motions for a new trial were entitled to plenary review by the motion judge pursuant to G. L. c. 278, § 33E").

i.  Mental impairment instruction.  First, we consider whether trial counsel's failure to request a mental impairment jury instruction as part of the self-defense instruction constituted ineffective assistance.  Specifically, the defendant urges that trial counsel should have requested the following model jury instruction:

> "You may consider the defendant's mental condition at the time of the killing, including any credible evidence of mental impairment . . . in determining whether the defendant actually believed that he was in immediate danger of serious bodily harm or death, but not in determining whether a reasonable person in those circumstances would have believed he was in immediate danger."

Model Jury Instructions on Homicide 29.[23]

"'[W]here evidence of the defendant's mental impairment is significant and where it is a critical aspect of [the defendant's] defense, the failure to instruct the jury that they could consider evidence of that impairment' is error."  Commonwealth v. Armstrong, 492 Mass. 341, 352 (2023), quoting Commonwealth v. Rutkowski, 459 Mass. 794, 799 (2011).  Brown's testimony that the defendant suffered from PTSD at the time he shot the victim provided a basis for the mental impairment

---

[23] In his brief, the defendant fails to quote the portion of the instruction instructing the jury not to consider the defendant's mental impairment "in determining whether a reasonable person in those circumstances would have believed he was in immediate danger."  Model Jury Instructions on Homicide 29.

instruction.[24]  See Armstrong, supra at 352-353, quoting Commonwealth v. Santiago (No. 2), 485 Mass. 416, 426-427 (2020) ("To be entitled to a mental impairment instruction, 'a defendant must, at a minimum, introduce evidence that such an impairment existed at the time of the conduct in question'").

Nonetheless, the defendant has not shown that trial counsel's decision not to request such an instruction was manifestly unreasonable.  See Weaver, 474 Mass. at 808.  While the model instruction permits the jury to consider the defendant's mental impairment in determining whether the defendant "actually believed" he was in imminent damager at the time of the killing, it also instructs the jury to disregard such evidence when determining "whether a reasonable person in those circumstances would have believed he was in immediate danger."  Model Jury Instruction on Homicide 29.[25]  It was not

---

[24] Based on a psychodiagnostic interview with the defendant and after reviewing the police reports and other statements pertaining to the defendant's case, Brown opined that the defendant suffered from PTSD when he killed the victim.  Brown explained that the defendant exhibited the five required conditions for PTSD:  he experienced a situation in which his life was acutely endangered ("he was shot at and wounded, and . . . his friend was killed"), he had intrusive experiences, he became avoidant ("he was really freaked out about going anywhere"), he experienced alterations in mood ("he began to become very paranoid"), and he experienced arousal (he was "hypervigilant" and "looking around all the time").

[25] Evidence of mental impairment bears upon the subjective portion of self-defense -- whether the defendant actually believed he was in imminent danger -- but not in determining

manifestly unreasonable for trial counsel to reject this instruction in favor of the one given by the judge, which allowed the jury to "consider all of the circumstances bearing upon the defendant's state of mind at that time."

Moreover, assuming arguendo that the failure to request the instruction was manifestly unreasonable, the defendant has not shown that the failure created a substantial likelihood of a miscarriage of justice. Because of the strong evidence that the defendant premeditated his killing of the victim, see note 21, supra, the requested mental impairment instruction was not likely to have influenced the jury's conclusion. See Gibson, 492 Mass. at 568.[26]

---

"whether a defendant's belief concerning his exposure to danger was reasonable." Commonwealth v. Barros, 425 Mass. 572, 576 (1997) ("[s]ince malice does not require any actual or subjective intent to kill or to inflict grievous bodily harm, there is no basis in our law for the defendant's suggestion that provocation should be viewed subjectively . . . [and] [t]he same holds true for the self-defense test" [quotation and citation omitted]).

[26] In addition, Brown's opinion rested on the defendant's alleged fear of going outside and general paranoia; yet the evidence was to the contrary. Forget testified that the defendant went out on the day before the cemetery shooting as well as on the day of the killing. Following the shooting, the defendant accompanied his friends to Crystal Park and warned fellow KSP gang members. In the weeks that followed the cemetery shooting, the defendant posted photographs on social media of himself at a beach in the Dominican Republic. Also, although Brown's opinion rested on the defendant's scores on the Trauma Symptom Inventory Standardized Test for defensive avoidance, depression, and intrusive experiences, each of these was barely above the cut-off for "clinically significant"

ii. Prior firearm adjudication. The defendant maintains that trial counsel erred during the defendant's direct examination by asking the defendant whether he had a firearm from October 2014, the time of the Obeng shooting, to June 2015, the time of the nightclub shooting. He contends that this line of questioning was manifestly unreasonable because it allowed the prosecutor to raise on cross-examination evidence of the defendant's juvenile firearm adjudication, which trial counsel successfully had excluded before trial through a motion in limine. We agree with the judge that the defendant has not made the requisite showing. To begin, trial counsel did not aver that these questions lacked a strategic basis. In fact, the questions elicited the defendant's testimony supporting his PTSD diagnosis and his claim of self-defense.

Contrary to the defendant's contention, trial counsel strategically limited the time frame of the questions so as to avoid opening the door to the defendant's prior firearm adjudication. Rather, the defendant opened the door on cross-examination when he testified affirmatively to the prosecutor's question whether his position was that he "never handled a gun

---

scores. Cf. Rutkowski, 459 Mass. at 799 (failure to instruct on mental impairment warranted new trial given defendant's "long history of serious mental illness"); Commonwealth v. Gould, 380 Mass. 672, 678 (1980) (same, given expert testimony that defendant "had suffered from a severe and long-standing mental illness").

until June of 2015." This statement by the defendant, and not his responses to trial counsel's more limited questions during his direct examination, allowed the prosecutor to raise the defendant's prior adjudication. See Commonwealth v. Roderick, 429 Mass. 271, 275 (1999) ("when the defendant answered untruthfully that he had never carried a gun, he opened the door to admission of the evidence of his prior conviction for gun possession").

iii. Failure to object during cross-examination. The defendant raises several instances in which trial counsel purportedly should have, but failed to, object during the prosecutor's cross-examination of the defendant. We examine each of these decisions in turn to determine whether there was error and, if so, whether the error created a substantial likelihood of a miscarriage of justice. See Gibson, 492 Mass. at 568.

A. Gang "lifestyle." The prosecutor cross-examined the defendant as follows:

Q.: "And you're a Kilby Street Posse member?"

A.: "Yes."

Q.: "Been one for well over a decade?"

A.: "Yes."

Q.: "That lifestyle involves guns, drugs, violence?"

A.: "No."

Q.:   "It doesn't involve any of that?"

A.:   "Not to me --"

Q.:   "You've never been involved in --"

A.:   "I've never done drugs in my life."

Q.:   "You never sold drugs in your life?"

A.:   "Nah."

After this exchange, the prosecutor impeached the defendant with a 2017 heroin trafficking conviction that previously had been excluded by trial counsel in a pretrial motion in limine.  Trial counsel did not object.

Trial counsel's failure to object to the prosecutor's questions regarding the defendant's "lifestyle" and drug activities did not create a substantial likelihood of a miscarriage of justice.  See Gibson, 492 Mass. at 568.  First, the judge gave a limiting instruction that the jury could consider prior convictions only for impeachment purposes, and that the jury could not consider the convictions as proof that the defendant committed the crime at hand or that the defendant had a criminal personality or bad character.[27]  See Commonwealth

---

[27] The judge's instruction stated in full:

"The defendant is not charged with committing any crime other than the murder charge contained in the indictment. You have heard mention of other crimes as to which the defendant pleaded guilty or was otherwise convicted.  You are not to take that as a substitute for proof that the defendant committed the crime charged here, nor you -- may

v. Bly, 444 Mass. 640, 653 (2005) (no substantial likelihood of miscarriage of justice from prosecutor's improper discussion of details underlying prior convictions where "limiting instruction as to the proper use of prior convictions adequately addressed the prosecutor's error"); Commonwealth v. Harris, 443 Mass. 714, 721 (2005) (where judge allows introduction of prior conviction, "potential prejudice may be ameliorated by an appropriate limiting instruction"). See also Commonwealth v. Gonzalez, 473 Mass. 415, 427 (2015) ("Jurors are presumed to follow [the judge's] instructions"). Moreover, the evidence of the defendant's deliberate premeditation was overwhelming. See note 21, supra.

B. Social media photographs. The defendant argues that trial counsel's failure to object to two photographs depicting the defendant in the Dominican Republic was error because the photographs portrayed the defendant as "callous" and were unrelated to the issues of deliberate premeditation and self-defense. Counsel averred that his failure to object was an oversight and not strategic. However, the photographs, which were posted within months of the cemetery shooting, were

you consider it as proof that the defendant had a -- has a criminal personality or a bad character. Specifically, you may not use this evidence to conclude that if the defendant committed other crimes, he must also have committed this crime."

evidence of the defendant's state of mind; they raised doubt as to the defendant's theory that he was isolated due to PTSD, because they show him out in public in the company of others, as opposed to being "wounded" and "really freaked out about going anywhere" as Brown testified. Any objection by trial counsel would have been futile. See Mendes, 441 Mass. at 466-467 (postcrime conduct admissible to show state of mind).

C. Prearrest silence. The prosecutor questioned the defendant regarding his failure to contact the police after the shooting. Specifically, the prosecutor asked:

Q.: "Did you call the police after you shot and killed David Luyando?"

A.: "No."

Q.: "Did you call the police after you got back from Crystal Park?"

A.: "I actually did call the police."

Q.: "Oh, you called the police --"

A.: "And you can check it on record. I did call the police. I was going to tell them what happened, but I was too scared for myself, so I didn't tell them."

The prosecutor raised the issue a second time, asking whether the defendant was dropped off at the police station after the shooting, whether he turned himself in and claimed self-defense and, again, whether he called the police. In his closing argument, the prosecutor also alluded to the defendant's

prearrest silence, stating that the defendant is "not being dropped at the police station to claim self-defense."

While the Commonwealth rightly concedes that the prosecutor's questions and closing argument were improper, see Commonwealth v. Gardner, 479 Mass. 764, 769 (2018) ("the defendant's prearrest silence typically is of limited probative value" because "there may be many reasons why a defendant does not wish to come forward and speak to the police that have no bearing on his guilt or innocence"), trial counsel's failure to object did not create a substantial likelihood of a miscarriage of justice. Other evidence indicated the defendant's consciousness of guilt, such as the disposal of his firearm and cellular telephone and his flight to the Dominican Republic. See Correia, 492 Mass. at 236 ("Where there is other, properly admitted evidence of consciousness of guilt, e.g., flight, . . . a substantial risk of a miscarriage of justice is unlikely"). And, as detailed in note 21, supra, the evidence that the defendant did not act in self-defense was overwhelming. See Gardner, supra at 773 (prosecutor's references to defendant's prearrest silence did not create substantial likelihood of miscarriage of justice "because the defendant's testimony and self-defense claim were extensively and primarily undermined by other evidence at trial").

D. <u>Badgering</u>.  The defendant contends that trial counsel improperly failed to object to the prosecutor's aggressive cross-examination.  To be sure, some[28] of the exchanges between the prosecutor and the defendant were testy, with the prosecutor's questioning crossing the line.  But, as the judge noted, the defendant held his own and was "no shrinking violet."  And, because the judge interjected to control the exchanges, it was not manifestly unreasonable for trial counsel to decide to forgo further objections.[29]

---

[28] The defendant alleges the following questions on cross-examination were improper:  whether "the person you actually killed, was an unarmed twenty-two year-old non-gang member"; whether the victim "deserved to be killed" because the victim had "throw[n] up" gang signs in pictures;  whether the defendant's actions were the "actions of a hero"; whether "the only person who agrees with you is you" about seeing a gun in Parker's car; and whether "all these people [(Delossantos and Taylor)] knew who shot you, but you had no idea?"  Also, in response to the defendant repeatedly stating that he was "defending [him]self," the prosecutor remarked, "You keep saying that" and "That's a great phrase."  The prosecutor's sarcastic remarks -- about the victim deserving to be killed, the defendant acting as a hero, and the defendant's claim to self-defense being a "great phrase" -- were improper.  See <u>Commonwealth</u> v. <u>McDermott</u>, 493 Mass. 403, 413 (2024) (prosecutor badgered defendant by stating, "You're a pretty good shot" in response to defendant's assertion he did not see victim while shooting); <u>Commonwealth</u> v. <u>Cadet</u>, 473 Mass. 173, 186 (2015) (sarcastic questions improper).

[29] For example, when the defendant repeatedly noted he was "defending [him]self" and the prosecutor responded, "That's a great phrase," the judge said, "I think we understand both party's positions.  Let's move on."  In response to the prosecutor's "actions of a hero" question, see note 28, <u>supra</u>, the judge said, "That's a little argumentative . . . .  Let's just move on."  And during a particularly contentious back-and-

The judge indicated that the prosecutor's questions that no witness besides the defendant testified to seeing anyone in Parker's car with a gun "did at least come close to asking [the] [d]efendant to comment on the credibility of other witnesses." See Commonwealth v. Fahey, 99 Mass. App. Ct. 304, 310 (2021), quoting Commonwealth v. Triplett, 398 Mass. 561, 567 (1986) ("[i]t is a fundamental principle that a witness cannot be asked to assess the credibility of his testimony or that of other witnesses" [quotation omitted]). However, the prosecutor did not ask the defendant directly to comment upon the witnesses' credibility, highlighting "that there were inconsistencies between the defendant's testimony and that of other witnesses" (alteration and citation omitted). Commonwealth v. McDermott, 493 Mass. 403, 415 (2024) (no error where defendant "was not asked whether [other witnesses] lied" but "to square his version of the facts" with their testimony). Moreover, any error did not create a substantial likelihood of a miscarriage of justice given the overwhelming evidence of the defendant's guilt.[30] See

---

forth in which the prosecutor and the defendant were talking over each other, the judge directed both the prosecutor and the defendant to "please stop" and, turning to the prosecutor, the judge admonished, "I will ask you to ask another question that's not argumentative." When the prosecutor followed with another argumentative question, the judge said, "I'm going to sustain my own objection to that question. It's been asked and answered, and it's argumentative."

[30] See note 21, supra.

Commonwealth v. Pierre, 486 Mass. 418, 435 (2020) ("Considering the strength of the evidence against the defendant, we conclude that these impermissible comments by the prosecutor did not create a substantial likelihood of a miscarriage of justice").

E. Defendant's gang affiliation. The defendant alleges trial counsel erred by failing to object to cross-examination regarding the defendant's gang affiliation.[31] "Evidence of gang affiliation may be admissible to show motive." Commonwealth v. Lopes, 478 Mass. 593, 604 (2018). "We have, however, urged caution in admitting gang-related evidence because of the risk of suggesting that the defendant may have a propensity for criminality or violence." Id.

Here, any objection to questions regarding the defendant's gang affiliation would have been futile because gang rivalry, and the defendant's and Parker's role in it, was relevant to show motive. See Commonwealth v. Wardsworth, 482 Mass. 454, 471 (2019) ("Evidence of animosity between the gangs was admissible

---

[31] The prosecutor asked the defendant if he "brag[ged] on social media about being a gang member." Regarding one of the defendant's social media photographs, in which the defendant and a group of men were holding up three fingers, the prosecutor asked whether the defendant and his associates were "throwing up threes . . . a Kilby Street gang member sign." The prosecutor also asked whether the friend the defendant was with on the night he was shot, and the friend whose house the defendant was going to on the day of the cemetery shooting, were KSP members. At one point, the prosecutor pointed to certain individuals watching the trial and asked if they too were KSP members.

. . . to establish the defendant's motive for committing the crimes"); Lopes, 478 Mass. at 604 ("long-standing and ongoing dispute between" three gangs admissible to show defendant's motive and intent).  The Commonwealth theorized that the shooting was part of a larger, decades-long gang feud between the PSP and the KSP.  The prosecutor's questions highlighted that the defendant was with fellow KSP members during crucial events leading up to the cemetery shooting:  the defendant witnessed the shooting of Christian Obeng, a KSP member, in October 2014; the defendant was with Fabian Beltran, another KSP member, when shot by Parker; and the defendant had visited a third alleged KSP member on the day before the cemetery shooting.  Obeng's and Beltran's gang affiliation particularly was relevant to show that the defendant may have shot at Parker in retaliation for two past shootings involving himself and other KSP members.  See Commonwealth v. Barbosa, 477 Mass. 658, 672 (2017) (evidence admissible to support Commonwealth's theory that murder was motivated by "retaliation for the defendant's and [a fellow gang member's] injuries from . . . [an] altercation with a leader of [a rival gang]").

The prosecutor's conduct -- pointing to certain individuals who were watching the trial and asking, "Who is a member of Kilby Street Posse? . . .  Those guys right there?" -- was improper.  However, trial counsel objected to the question, and

the judge struck the defendant's response[32] and directed the prosecutor "not to go there." See Gonzalez, 473 Mass. at 427. Trial counsel did not provide ineffective assistance. See Commonwealth v. Gonsalves, 488 Mass. 827, 844-845 (2022) ("it is difficult to see what more trial counsel could have done" beyond successfully objecting to prosecutor's insinuation that member of gallery was intimidating witness).

F.  Gang opinion evidence.  Roberge, an officer in the Worcester police department's gang unit, testified for the Commonwealth regarding the cemetery shooting; he was called to testify again by the defendant about Parker's nightclub shooting of the defendant.  On cross-examination, the prosecutor elicited from the officer that, based on his training and experience as a gang unit member, gang members do not carry firearms all the time; instead, Roberge testified, they do so for specific purposes with an intent to use them.

Roberge's testimony that gang members generally carry firearms only when they intend to use them was improper. Commonwealth v. Henley, 488 Mass. 95, 128 (2021) (expert gang testimony improper where "general comments regarding gangs in the Boston area went beyond what was probative of the

---

[32] The defendant said that he did not know the people at whom the prosecutor was pointing and then said, "No, that's my cousin and family members."

defendants' criminal liability" and suggested propensity to commit violence). Trial counsel's failure to object, however, did not create a substantial likelihood of a miscarriage of justice because the defendant's gang membership was undisputed, the judge gave a limiting instruction on the use of gang evidence,[33] and the judge questioned potential jurors during voir dire to screen out those with biases against gang members.[34] See id. at 128-129 (improper gang testimony not reversible error where defendant's gang membership not in dispute and "judge gave an effective limiting instruction"); Commonwealth v. Phim, 462 Mass. 470, 478 (2012) (judge limited prejudicial effect of gang evidence by issuing limiting instruction and asking jurors during voir dire whether gang evidence would affect their impartiality). Cf. Wardsworth, 482 Mass. at 467-468, 470, 472

---

[33] The judge gave a lengthy instruction during the Commonwealth's case-in-chief regarding gang evidence. Among other things, the judge instructed that "[the defendant] is not on trial for being a member of the Kilby Street gang" and that "[y]ou may consider the evidence of his membership in that gang as bearing upon his motive for the alleged murder of [the victim], but you may not consider it for the purpose of showing that [the defendant] is or was a bad person or has the propensity to commit criminal acts or the propensity to be violent." The judge restated this instruction after closing argument.

[34] On the juror questionnaire, potential jurors were asked whether they could be fair and impartial when hearing evidence about possible gang affiliation. The judge struck several potential jurors from service for their response to that question.

(expert gang testimony constituted reversible error where expert testified to defendant's gang affiliation without sufficient factual support and judge "placed virtually no limitation on the use of the evidence").  Moreover, the defendant himself testified that he did not carry firearms generally but did so only after the nightclub shooting.  This was consistent with Roberge's testimony.  See Commonwealth v. Smith, 450 Mass. 395, 399, cert. denied, 555 U.S. 893 (2008), S.C., 493 Mass. 1037 (2024) (even if expert gang testimony "constituted . . . improper opinion evidence[,] . . . any error was harmless because . . . other witnesses testified from personal knowledge essentially to the same effect").

G.  Appeal to jury's sympathy.  The victim's father testified that his son cared for the son's sick mother, that he was devastated when he received a telephone call about his son's shooting, and that it was a heart-wrenching decision to "pull the plug" on his son.  The emergency room physician testified at length to the gruesome details of the victim's injuries and to the attempted life-saving measures used on the victim.  The prosecutor compared the victim's fatal gunshot wound with the defendant's slighter wound to the arm during the nightclub

shooting,[35] and referred to the victim as an "unarmed twenty-two year old non-gang member."

"It is well settled that a prosecutor may not appeal to the jury's sympathy." Commonwealth v. Doughty, 491 Mass. 788, 797 (2023). In particular, a prosecutor may not "emphasize 'personal characteristics [that] are not relevant to any material issue,' if such emphasis would 'risk[] undermining the rationality and thus the integrity of the jury's verdict.'" Id., quoting Commonwealth v. Fernandes, 487 Mass. 770, 791 (2021), cert. denied, 142 S. Ct. 831 (2022). However, a prosecutor may "tell the jury something of the person whose life had been lost in order to humanize the proceedings." Doughty, supra at 798, quoting Fernandes, supra.

Here, failure to object to the prosecutor's reference to the victim as an "unarmed twenty-two year old non-gang member" was not error because, as the judge noted, the prosecutor "did not excessively highlight" this fact. See Commonwealth v. Grier, 490 Mass. 455, 471-472 (2022) (no error in prosecutor's statement that victim was an "unarmed, defenseless sixteen year

---

[35] Regarding the defendant's wound stemming from the nightclub shooting, the prosecutor asked the defendant on cross-examination, "You knew you weren't struck in the head?"; "No bullet entered the left side of your skull and exited the right side of your skull, did it?"; and "You were determined a Priority 3 to the hospital . . . [b]ecause you were shot in the arm?"

old" because it was true in fact and referenced sparingly).

However, excessive appeals to sympathy that did not pertain to any material issue at trial -- such as the victim taking care of his mother, the father's experience of the victim's death, and the physician's extensive lifesaving efforts -- were improper. See Commonwealth v. Cheng Sun, 490 Mass. 196, 211-212 (2022) (testimony of victim's son detailing victim's work ethic and relationship with son improper); Commonwealth v. Santiago, 425 Mass. 491, 497 (1997), S.C., 427 Mass. 298 and 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998) (testimony of victim's sister discussing her "own experience concerning the victim's death" improper). The physician's gruesome description of the victim's wounds and the prosecutor's comparisons between the victim's and the defendant's injuries were also improper because they did not serve the Commonwealth's theory that the defendant killed with deliberate premeditation. See Commonwealth v. Camacho, 472 Mass. 587, 608 (2015) (prosecutor's description of crime scene as "[a] blood pool, a puddle of blood . . . seeping out of [the victim's] body" improper). Cf. Commonwealth v. Robinson, 493 Mass. 303, 317-318 (2024) ("description of the extent of the victim's injuries did not amount to error" because, unlike here, prosecutor proceeded on theory of extreme atrocity or cruelty).

Nonetheless, trial counsel's failure to object to these improprieties did not create a substantial likelihood of a

miscarriage of justice because, inter alia, they did not unfairly discredit the defendant's theory of self-defense. See Cheng Sun, 490 Mass. at 213 (no substantial likelihood of miscarriage of justice where "the improper statements did not go to the heart of the defense strategy and were irrelevant to any disputed issue of fact"). In addition, the judge instructed the jury that they may not decide the case based "on sympathy for any party, or witness, or anyone else." See Camacho, 472 Mass. at 609 (no substantial likelihood of miscarriage of justice where judge instructed jury "not to be swayed by . . . sympathy" and "jury have the ability to discount hyperbole and other improper statements" [citation omitted]). The strong evidence of the defendant's guilt, as discussed in note 21, supra, further renders the "improper appeals to sympathy . . . less crucial." Fernandes, 487 Mass. at 791, quoting Commonwealth v. Kent K., 427 Mass. 754, 761 (1998). See Doughty, 491 Mass. at 799.

H. Delayed disclosures. While the defendant claims that trial counsel erred by not objecting to the prosecutor's delayed disclosures,[36] as discussed supra, the disclosures did not likely influence the jury's verdict.

---

[36] As discussed supra, trial counsel objected to the admission of the social media posts.

I.  Cumulative error.  The defendant contends that, even if no single error created a substantial likelihood of a miscarriage of justice, they do in sum.  We disagree.  As discussed supra, the evidence of the defendant's deliberate premeditation was strong.

d.  Review under G. L. c. 278, § 33E.  For the same reason, we discern no basis for providing relief under G. L. c. 278, § 33E, to reduce the defendant's verdict.

4.  Conclusion.  The defendant's conviction of murder in the first degree is affirmed.  The order denying the defendant's motion for a new trial is also affirmed.

So ordered.